JOHN R. McCARTHY *vs.* BOSTON CITY HOSPITAL
& another.[1]

Suffolk.   November 4, 1970. — February 3, 1971.

Present: TAURO, C.J., SPALDING, REARDON, & QUIRICO, JJ.

*Doctor.   Negligence,* Doctor, Violation of law.   *Proximate Cause.*

At the trial of an action for malpractice against a hospital and a visiting radiologist directing its radiation therapy department and supervising the department's house staff, including its technicians, by one suffering from multiple myeloma who underwent three series of X-ray treatments at the hospital administered by the technicians under the supervision of its chief resident radiologist, expert medical testimony did not warrant findings of negligence on the part of the defendant radiologist or other doctors participating in the treatment with respect to any failure to change the filters used on the X-ray machine or to reduce the kilovoltage when skin damage and erythema appeared, or with respect to the development of two small ulcers which formed one big ulcer about a year after the last series of treatments ended, or with respect to continuing X-ray treatment after the skin damage was noted; and in the absence of evidence of any independent act of negligence on the part of the technicians, there was no error in the entry of verdicts for the defendants.   [644–645]

---

[1] The defendants originally also included Dr. William Curry Moloney, Dr. Paul O'Brien, and two technicians employed by the hospital, Mary P. Clark and Mary C. Murray, and John Doe. The counts against Dr. O'Brien and John Doe were waived by the plaintiff in open court. The jury returned verdicts for the defendants Dr. Moloney, Clark and Murray. Nothing is before us touching these counts.

At the trial of an action for malpractice against a hospital and a visiting radiologist directing its radiation therapy department by one suffering from multiple myeloma who underwent three series of X-ray treatments at the hospital administered under the supervision of the chief resident radiologist, and who developed ulcers necessitating surgery after the last series of treatments ended, there was no error in excluding testimony that shortly after the first series of treatment ended the period of a limited license to practise of the chief resident radiologist expired and the license was not renewed, where it appeared that the second and third series were given "according to the plan . . . [he] had originally decided upon" when he was duly licensed, in concurrence with the defendant radiologist, who personally examined the plaintiff before the start of the third series, and upon the original recommendation of another doctor, and there was no evidence of causal connection between the chief resident radiologist's lack of a license to practise and the plaintiff's injuries. [645–647]

TORT. Writ in the Superior Court dated November 20, 1964.

The action was tried before *Tomasello, J.*

*John Kimball, Jr.,* for the plaintiff.

*Robert G. Conley (Jacob J. Locke* with him) for Alfred W. Branca.

*Gerard A. Powers,* Assistant Corporation Counsel, for the Boston City Hospital.

SPALDING, J. This is an action of tort for malpractice. It comes here on the plaintiff's bill of exceptions following a jury trial which resulted · in verdicts for the plaintiff against Dr. Alfred W. Branca (Dr. Branca) and Boston City Hospital (hospital). The judge recorded the verdicts under leave reserved and thereafter granted motions of the defendants that verdicts be entered for the defendants.

A summary of the evidence most favorable to the plaintiff is as follows. The plaintiff, a sixty-three year old furniture refinisher and repairer, entered the hospital on November 1, 1962. His chief complaint was pain in his left leg of two years duration. During his hospitalization blood studies and X-rays of his hip were performed as well as a bone biopsy on his left pelvis. A diagnosis of multiple myeloma was made. Multiple myeloma is a malignant, fatal disease originating in the bone marrow, and is excruciatingly painful. The cause is not known. It always spreads until it is

either removed surgically by amputation or destroyed by X-ray. The choices of treatment of the plaintiff's condition were amputation, intensive radiation, or chemical therapy. None of these is ever entirely curative. The purpose of intensive radiation is to kill the cancerous lesion in an effort to save the patient's life and at the same time to relieve the pain.

The defendant Dr. William Moloney (Dr. Moloney) about November 21, 1962, recommended that the plaintiff undergo a series of intensive radiation therapy treatments. The plaintiff went to the X-ray department and met the defendants, Mary C. Murray (Murray) and Mary P. Clark (Clark), and Dr. Leopoldo Gonzalez (Dr. Gonzalez). The first series of X-ray treatments was from November 23, 1962, to December 20, 1962.

During the course of this series of treatments, Dr. Branca examined the plaintiff and his record with Dr. Gonzalez and agreed that the disease should be treated with extensive radiation in an attempt to destroy the malignancy. Thereafter the plaintiff returned to the radiation therapy department of the hospital for a second series of X-ray radiation treatments commencing January 20, 1963, and continuing through February 19, 1963. The plaintiff returned for a third series of X-ray radiation treatments to his hip on March 20, 1963, and these treatments continued until April 12, 1963. All of the plaintiff's radiation therapy treatments were administered by Murray and Clark under the supervision of Dr. Gonzalez. The total number of Roentgens received during the third series was considerably more than that received in either of the first two treatments.

After about two weeks of the third series of treatments, the plaintiff noticed that the skin of his left hip (in the area where he had received X-ray radiation treatment) had started to get hard and red, that it was sore, and that small blisters had started to develop. About one week after the last X-ray radiation treatment, the plaintiff visited the skin clinic of the hospital because the blisters began to break. He was instructed to use a Dakin solution. The outpatient

department records of the skin clinic contained a note dated April 26, 1963, as follows: "Diagnosis is acute radio dermatitis, early."

At the end of May, 1963, the plaintiff slipped and fell while getting out of his bathtub, injuring the area of his lesion and making his hip very sore. As a result, he went back to the hospital as an inpatient from July 15, 1963, to July 23, 1963. After the fall further complications developed, including infection of the lesion area. After April, 1963, and up through July, 1963, the skin on the plaintiff's left thigh began to heal, but then broke down and formed ulcerations. In November, 1963, this condition was stubborn and the plaintiff was referred to the surgical department of the hospital. In March, 1964, the two ulcers grew bigger and finally formed into one big ulcer.

On April 1, 1964, the plaintiff was admitted to the hospital as an inpatient and remained there until September 9, 1964. In June, 1964, the plaintiff's left leg and hind quarter were amputated. Dr. Moloney, in consultation with the surgeons, decided to take the plaintiff's leg off because it was infected and his life endangered; there was no doubt as to the correctness of his diagnosis. In August, 1964, the plaintiff's left testicle was removed.

Dr. Branca testified that irritation to the skin is expected to come from the X-ray machine and that frequently blisters develop on the surface of the skin as the result of something the X-ray machine puts out. There is present in the X-ray a type of ray that produces erythema on the skin. This can be modified by filters on the X-ray machine or by variation in the kilovoltage, but when erythema appears on a patient it is not appropriate to reduce the kilovoltage. When erythema appears the filters are not filtering all of the soft rays. No change in filters was made during the course of the plaintiff's treatment. Dr. Branca further testified that it is good medical practice to apply radiation therapy to an area of the body to the extent that blisters and ulceration develop in that area of the skin; but it is not good medical practice to apply radiation to the skin to the extent that ulcers de-

velop to a diameter of four inches and a depth of half an inch.

Dr. Branca was, during the time when the plaintiff received all three courses of radiation therapy, a part time visiting radiologist at the hospital assigned to direct the radiation therapy department and had supervision over the house staff at that department, including technicians Murray and Clark. He was not assigned to direct Dr. Gonzalez. From September, 1962, to July 19, 1964, Dr. Gonzalez was chief resident of radiology at the hospital, and was a full time associate radiologist. On July 19, 1964, he resigned to move to Ohio.

The judge excluded evidence offered by the plaintiff to show that Dr. Gonzalez had only a limited registration to practise medicine at the hospital, from June, 1960, through December 31, 1962, and that subsequent to December 31, 1962, he had no license to practise medicine in Massachusetts. The plaintiff duly excepted and made an offer of proof.

1. We first shall discuss whether there was evidence of negligence on the part of the hospital or its employees. In judging the actions of the doctors involved, the rule is that "One holding himself out as a specialist should be held to the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession. And, as in the case of the general practitioner, it is permissible to consider the medical resources available to him." *Brune* v. *Belinkoff*, 354 Mass. 102, 109.

In determining whether this standard has been satisfied, we must do so in the light of the settled principle that " 'It is only in exceptional cases that a jury instructed by common knowledge and experience may without the aid of expert medical opinion determine whether the conduct of a physician toward a patient is violative of the special duty which the law imposes as a consequence of this particular relationship.' . . . The exceptional cases seem to be those 'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge.' " *Haggerty* v.

*McCarthy,* 344 Mass. 136, 139. This is not one of those "exceptional cases."

The plaintiff urges that there is sufficient expert testimony that the X-ray treatment was prescribed and administered by employees of the hospital; that before the last series of treatments began, some skin damage had been noted; that, nevertheless, treatment was continued without modification of the filters on the X-ray machine, and with an actual increase in total dosage; that while even "blistering and ulceration is expected from x-ray treatments, it is not good medical practice to apply radiation to the skin to the extent that ulcers develop to a diameter of four inches and a depth of one half inch"; and that the ulceration of the plaintiff's skin developed larger than this as a result of the X-ray treatment.

As to the filters and dosage, there is no evidence that good medical practice required that the filters that were being used should have been changed. Moreover, there is expert evidence that when erythema appears it would not be appropriate to reduce the kilovoltage. There also is no evidence that it is not good medical practice to substantially increase the total number of Roentgens delivered in the final series of treatments. As to the continuation of treatment and the subsequent development of the large ulcer, there is no medical testimony to indicate negligence. Dr. Moloney testified that the plaintiff's skin "ulceration" in general was a result of the X-ray treatment. There is no evidence, however, that any ulceration developed during the actual treatment given by Dr. Gonzalez. The plaintiff himself testified that it was only at the end of the final series of the treatments (about April 12, 1963) that any blistering at all started and that he "did not call this to the attention of any of the defendants." It was a week later before the blisters began to break. At the end of May, 1963, he slipped and fell on the radiated area and thereafter the ulcers kept getting bigger and sorer. It was not until March, 1964, that the two small ulcers formed the one big ulcer referred to in the testimony.

With respect to continuing treatment after noting skin damage, the records of the hospital reveal the following notations, each signed by Dr. Gonzalez: March 19, 1963, "Patient seen today in clinic. Minimal skin changes in the left hip. . . ." April 3, 1963, "Skin in good condition." April 10, 1963, "Irritated skin shows moderate to marked erythema . . . skin tolerance is almost to the limit. We will give two more treatments . . . ." We do not believe that in these circumstances the evidence was sufficient for the jury to find any of the defendant doctors negligent. This conclusion, of course, encompasses the conduct of the defendant Dr. Branca. Nor is there evidence of any independent act of negligence on the part of the defendant technicians Clark and Murray. Moreover, the jury returned verdicts in their favor finding them not negligent. Thus no evidence of negligence was shown on the part of any person acting on behalf of the hospital, and the sole basis for imposing liability on the hospital was the alleged negligence of its employees. Therefore, we find that there was no error in the entry of verdicts for the hospital and Dr. Branca on the evidence admitted at trial.

2. It remains to consider whether it was error to exclude testimony that Dr. Gonzalez was not licensed to practise medicine in Massachusetts after December 31, 1962.

General Laws c. 112, § 6, provides sanctions for the unauthorized practice of medicine. "The purpose of the Legislature in enacting the statute . . . was not merely to provide a penalty for its violation, but equally to protect the public from ignorant and incompetent practitioners. The statute therefore must be construed as intended to afford relief by way of damages to all persons suffering harm where the violation of the statute is the *proximate cause* of the injuries" (emphasis supplied). *Whipple* v. *Grandchamp*, 261 Mass. 40, 45.

The plaintiff argues that this evidence should have been admitted by analogy to the doctrine regarding operation of a motor vehicle by an unlicensed person. See *Kenyon* v. *Hathaway*, 274 Mass. 47, 55.

The defendants, on the other hand, argue that even if this evidence had been admitted, there was still not sufficient evidence to take the case to the jury because there was no showing that could causally connect the lack of registration renewal with the plaintiff's injuries. The argument is that, in the absence of such causal connection, the offered evidence is irrelevant. We agree.

If the excluded evidence were admitted, it would have shown that Dr. Gonzalez had only a limited registration to practise medicine at the hospital with an affiliation in the Lahey Clinic from June, 1960, through December 31, 1962, after which he had no license to practise medicine in Massachusetts. The last time Dr. Gonzalez treated the plaintiff was in April, 1963, although he continued to serve as an associate radiologist at the hospital until he resigned in July, 1964. What possible connection his failure to renew his limited license had upon the treatment he administered to the plaintiff is not shown. The first treatment he supervised was administered while his license was still in effect. The second and third series of X-rays given during the period when he was not duly registered were given "according to the plan [Dr.] Gonzalez had originally decided upon" when he was duly registered. This plan had been concurred in by Dr. Branca and was itself originally recommended by Dr. Moloney. There is no contention that the second treatment was not entirely in accord with good medical practice. Further, Dr. Branca personally examined the plaintiff the day before the start of the third series. Thus, after Dr. Gonzalez's registration had expired, the plaintiff was examined, and his further treatment was concurred in, by a duly licensed physician. And there is nothing to indicate or suggest that had Dr. Gonzalez ceased to treat the plaintiff after his registration expired on December 31, 1962, the X-ray treatment given to the plaintiff would have been altered in any way.

In this regard the language of *Falvey* v. *Hamelburg,* 347 Mass. 430, 435, is instructive: "Negligence does not operate in a vacuum. Legal consequences result from it if,

but only if, the negligence is causally related to the harm complained of. As we said in *Baggs* v. *Hirschfield* . . . [293 Mass. 1] at p. 3, 'Negligence consisting in whole or in part of violation of law, like other negligence, is without legal consequence unless it is a contributing cause of the injury.' The defendant argues that the defendant's violation of law cannot be considered as evidence of negligence because it had no causal relation to the accident. We are of opinion that there is merit in this contention. We fail to see any causal relation between the illegal registration and the accident. It was merely an attendant circumstance or condition; it did not contribute to the accident. Of course it might be argued that but for the violation of law the car would not have been on the road and hence would not have been involved in the accident. But that can hardly be treated as a cause in the legal sense. The accident could just as well have happened had the car been legally registered. Questions of causation arising out of the violation of a penal statute are often questions of fact but they are such only where a finding of causal connection between the violation and the harm suffered is rationally permissible. Where it is not, the question ceases to be one of fact." No doubt there could be situations where proof of non-registration of a physician would constitute negligence causally related to the harm suffered by the patient. See, e.g., *Whipple* v. *Grandchamp*, 261 Mass. 40, 45. But the case at bar is not such a case, because even if the excluded evidence had come in, as matter of law it would not have added enough to the plaintiff's case to avoid the entry of a verdict under leave reserved. Because of this conclusion, we do not reach the question whether the hospital is the proper defendant, and if so, whether it is protected by the doctrine of municipal immunity, as being maintained by the city of Boston.

<em>Exceptions overruled.</em>