JULIANNE GRASSIS [1] *vs*. ALAN B. RETIK & others. [2]

No. 87-290.

Suffolk. January 15, 1988. — April 12, 1988.

Present: PERRETTA, KAPLAN, & DREBEN, JJ.

*Practice, Civil,* Instructions to jury, Directed verdict, Comment by judge. *Negligence,* Medical malpractice, Doctor. *Doctor,* Duty to disclose risk. *Evidence,* Medical malpractice, Failure to produce witness. *Medical Malpractice,* Consent to medical treatment, Expert opinion, Standard of care.

At the trial of a medical malpractice action, no error was committed when the judge suggested to the plaintiff's counsel that he should phrase his questions to a defendant more accurately. [599-600]

At the trial of a medical malpractice action no error arose from the defense counsel's single reference in closing argument to the plaintiff's failure to have called, as an expert witness, a certain physician who had treated her. [600-601]

At the trial of a medical malpractice action no error arose from the judge's instructions on the burden of proof. [601-602]

At the trial of a medical malpractice action no error was occasioned by the judge's instructions on the standard of care to which the defendant physicians were to be held, where, in the circumstances, no reasonable juror could have understood the instructions to mean that a physician could escape liability merely by having had good intentions. [602-603]

At a medical malpractice trial the judge did not improperly charge the jury with respect to a matter of fact, nor did he express a preference for either party's expert witness. [603-604]

The judge in a medical malpractice action properly directed verdicts in favor of two of the defendant physicians at the close of all the evidence. [604]

CIVIL ACTIONS commenced in the Superior Court Department on February 7, 1983.

---

[1] The action was brought on behalf of the minor plaintiff by her father as next friend.

[2] Robert J. Sher, Gianna Stellin, and Warren E. Grupe.

The case was tried before *John L. Murphy, Jr.*, J.
*Elizabeth N. Mulvey* for the plaintiff.
*D. Alice Olsen* for Robert J. Sher.
*Lionel H. Perlo* for Alan B. Retik.
*John P. Ryan* for Gianna Stellin.

KAPLAN, J. 1. The plaintiff Julianne Grassis was born with a double ureter or double collecting system in her urinary tract. This malformation exposed her to infections as bacteria in her urine tended by "reflux" action to pass into the kidneys. The child early began to suffer such infections accompanied by fever. When she was about two and one-half years old, in January, 1980, showing extreme temperature, she was admitted on advice of her pediatrician to Lawrence General Hospital. In two and one-half days of hospitalization, she received two doses, thirty milligrams each, of the drug gentamicin, and the condition appeared to clear. During the month following her discharge from Lawrence General, however, Julianne experienced recurrent high temperatures. On February 20, again with excessive temperature, she was admitted to Children's Hospital in Boston under the care of the defendant Dr. Retik, chief of pediatric urology at Children's, who had seen Julianne earlier when her pediatrician turned to him for specialized assistance. It had been Dr. Retik's opinion that eventually the child should undergo surgery to correct the ureter problem.

In the manner common at Children's, Dr. Retik, the attending physician, worked with the assistance of assigned residents, all constituting a team. Two of these residents were the defendants Dr. Sher and Dr. Stellin, the former a resident in urology rotating for three months at Children's from Lahey Clinic, the latter a general surgery resident spending her third year at Children's after two years at a hospital in New York. Dr. Retik called in the defendant Dr. Grupe, chief of pediatric nephrology at Children's, to consult about the child's episodes of hypertension.

In addition to procedures such as the use of cooling blankets to reduce the child's fever, the child was given doses, at intervals of eight hours, of 25 milligrams of gentamicin, accompanied with doses of ampicillin, to combat the infection reach-

ing into her kidneys. From February 20 to 27, she received nineteen such applications. On February 29, Dr. Retik performed the surgery he had foreseen. This was successful; Julianne had suffered no further bouts of kidney infection up to the time when she testified at trial in October, 1986.

About six months after the surgery, the child's parents began to observe behavior on the child's part which made them apprehensive that her hearing had become impaired. Tests confirmed that her hearing in each ear was about 35% of normal. The eighth cranial nerve was deteriorated.

2. The present malpractice action, commenced on February 7, 1983, may be taken broadly as charging negligence and failure to obtain informed consent.

Trial occupied seven days and the evidence was exhaustive and voluminous. The testimony of experts was of course central. For the plaintiff, Dr. Joseph A. Martino, a nephrologist, was called. (Plaintiff's counsel also interrogated Dr. Retik as part of the case in chief.) The expert witness for the defense was Dr. Grupe; originally named a defendant in the action, he was dismissed on plaintiff's motion at the close of her case.[3]

Speaking in broad outline, omitting many details, we may summarize the plaintiff's submission thus. Gentamicin, a powerful drug, carried, as one of its possible side effects, impairment of hearing. So the "Physicians' Desk Reference" indicated. Dr. Martino thought Julianne's condition had not been so serious as to call for heroic measures, and therefore the use of gentamicin, at least in the sustained doses mentioned, was questionable. If gentamicin was thus employed, its use must be carefully monitored, and if kidney function — chiefly the filtering function — was seen to be impaired, the drug must be discontinued. Here it was indicated, according to certain serum creatinine levels, that function was being impaired, with danger that the patient's blood would become toxic with the gentamicin. A blood serum test could have been applied from

---

[3] As will appear, the judge allowed Dr. Stellin's motion for a direction at the close of the plaintiff's case, so it was Dr. Retik and Dr. Sher who called Dr. Grupe.

time to time to measure toxicity, but the test was not employed. The expert concluded that treatment as a whole was below standard and that the hearing damage was causally related. Further, the plaintiff sought to prove that the child's parents were not informed of the relevant perils.

In stating the position of the defense, again we offer only an outline. In Dr. Grupe's opinion, the child was in a serious, life-threatening condition when she entered Children's. For that predicament, gentamicin plus ampicillin, working synergistically upon the infection (streptococcus faecalis), were the drugs of choice. If kidney function was impaired, the prescription of gentamicin would indeed have to be reconsidered; but upon proper analysis of the data, including the serum creatinine levels, a treating physician could reasonably conclude there was no impairment of function. With normal kidney function and the low dosage of gentamicin that was applied for a relatively short period of time, there was only a very small or negligible possibility that the patient's blood would be affected toxically by this drug. So blood testing was unnecessary. The hearing loss might have been due to the infections, hypertension, or genetic fault;[4] it was not shown to have been caused by the gentamicin. Further, there was no failure to impart information to the parents.

3. As already noted, the plaintiff voluntarily dismissed Dr. Grupe as a defendant, and Dr. Stellin's motion for a direction was allowed at the close of the plaintiff's case, see note 3, *supra* (the plaintiff had previously waived any claim against Dr. Stellin regarding informed consent). At the close of all the evidence, the judge allowed Dr. Sher's motion for a directed verdict to the extent of the issue of informed consent. Thus the case went to the jury on the negligence issue with respect to Dr. Sher, and on the negligence and informed consent issues as to Dr. Retik. The jury brought in verdicts for these defendants.

On the plaintiff's appeal, she claims errors in the directions in favor of Dr. Stellin and Dr. Sher, and attacks the verdicts

---

[4] Julianne was born with a sixth digit on her right hand, which was removed, and with an "in-toed" alignment of her feet. Her mother was born with three kidneys.

on the grounds of alleged errors committed by the judge in the course of trial. That the verdicts were adequately supported by the evidence is not disputed.

4. We deal first with the judge's alleged errors claimed to impeach the verdicts.

(a) As mentioned above, the plaintiff's counsel called Dr. Retik during the case in chief. On direct examination, Dr. Retik stated that he had not monitored blood levels (to assess possible toxicity from the gentamicin). Counsel said, "And that was a violation of what the 'PDR' [Physicians' Desk Reference] calls for, was it not, Doctor?" Counsel for all defendants objected, and the judge said: "[T]he 'desk book' has no legal significance. It is a book put out of studies that are made by the pharmaceutical companies. It has no force when you say 'does it violate that.' There is nothing to violate." Plaintiff's counsel said, "I object" (but did not seek opportunity to elaborate). The judge said, "You may ask him if it [i.e., the omission to monitor] did not conform with the suggestions. But be careful with your language."

The question to Dr. Retik using the word "violated" was improperly tendentious for the reason indicated by the judge: it could be understood to imply that a physician who did not follow the PDR was by that token irretrievably guilty of a breach of professional standards. The judge was right to recommend that counsel improve his interrogation. Counsel went on with his questioning of Dr. Retik.

This is not the occasion to go into the issue how far the PDR may figure as probative of the proper medical standard in the use of a drug or as putting physicians on notice of facts or opinions about a drug.[5] There can be no claim, however, that the PDR, without more, amounts to an absolute rule of conduct, as counsel's question intimated. We do not read the

---

[5] These questions are not settled in the Commonwealth. References to PDR or manufacturer's brochures appear in *Brune* v. *Belinkoff,* 354 Mass. 102, 109-110 (1968); *Arthurs* v. *Board of Registration of Medicine,* 383 Mass. 299, 305 n.13 (1981); *Beeler* v. *Downey,* 387 Mass. 609, 610 (1982); *Precourt* v. *Frederick,* 395 Mass. 689, 693 (1985); *Jasper* v. *Tomaiolo,* 20 Mass. App. Ct. 201, 202 n.2 (1985).

plaintiff's expert as making so strong a claim; Dr. Retik said PDR was "helpful in a number of ways" but was not the "gold standard," and Dr. Grupe said PDR was "a handy, but incomplete collection of information," not a "medical text" or the "only standard." The judge did not deal specifically with the PDR in his instructions and no objection was taken on that account.

(b) In his closing argument to the jury, Dr. Retik's counsel stressed that the plaintiff had not come forward with adequate proof that the doses of gentamicin had caused Julianne's loss of hearing.[6] An audiologist had testified to the degree of the loss, but regarding causation one would want testimony by otolaryngologists (ear, nose, and throat specialists) and none had been presented. Counsel for Dr. Sher, in his closing argument, made the same point. He also said, "Where is the plaintiff's otolaryngologist, Dr. Friedman?" Dr. Ellen Friedman had examined Julianne when concern developed about her hearing, and had referred the child to the audiologist for hearing measurement. Following all the closing arguments, the plaintiff's counsel objected to the mention of Dr. Friedman. He was contending, in effect, that this suggested, erroneously, she was a "missing witness": a witness the plaintiff would have called if her expected testimony would help her patient's lawsuit, so that the failure to call her justified an inference that her testimony would be unfavorable. See the formulation in *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-294 (1974); *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134-135 (1986).

The following considerations apply to the plaintiff's objection. (i) It seems likely that the jury would take the (single) mention of Dr. Friedman, in context, as merely an exemplification of the fact that no testimony had been given by a specialist in the relevant category, and would not conceive that there was an invidious reason for the plaintiff's failing to call her. Cf. *Jensen* v. *McEldowney*, 341 Mass. 485, 487 (1960).

---

[6] The PDR had listed hearing loss as a possible side effect of the gentamicin and Dr. Martino (not an otolaryngologist) expressed his belief about a causal connection.

(ii) A case — although not an overwhelming one — could be made that here a "missing witness" inference could be correctly drawn. The plaintiff was hard pressed on the issue of causation, bore the burden of proof on it, and appeared to have easy access to the witness as she was evidently physically available (still working at Children's) and otherwise amenable as Julianne's treating physician at a critical time. Her testimony as a specialist might have distinct importance. And as was said in *Berry* v. *Stone*, 345 Mass. 752, 756 (1963), "It is reasonable in the usual case to expect a plaintiff to call an available physician who first attended her after her injury." (iii) Although counsel lodged an objection, he did not indicate what he wanted the judge to do. Had he thought about it, he might have concluded (and so might the judge) that it would hurt, not help, to focus the jury's attention by giving a full "missing witness" instruction or telling the jury to forget the particular reference to Dr. Friedman. See *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 133 & n.7. (iv) If error was committed, it should be counted a minor or trivial one in relation to the character and scope of the trial as a whole, and would not warrant allowing a new trial. Cf. *Bencosme* v. *Kokoras*, 400 Mass. 40, 44 (1987).

(c) Charging the jury on the plaintiff's burden of proof, the judge said it was proof "to a fair preponderance of the evidence," proof that "leads you to believe that what the plaintiff says is more true than not true"; " 'preponderance' means to outweigh"; "[s]o that if the evidence on the part of the plaintiff outweighs the evidence of the defendant, if it would send down a theoretical scale of justice; then the plaintiff has met the burden of proof that is put on him by law."

This instruction conveyed the right idea, cf. *Stepakoff* v. *Kantar*, 393 Mass. 836, 842-843 (1985), although one might prefer a more extended statement. The plaintiff has objected that the image created by the mention of scales was of their "crashing out of balance," rather than "tip[ping] ever so slightly," but we do not think the passage would be understood that way, especially when considered in relation to what preceded it. Again the plaintiff thought a public inured to television

crime might misunderstand the civil standard if it was not contrasted with the criminal. We do not think a charge contrasting the two standards was indispensable to a jury's apprehension of the civil standard.

(d) In charging on the care to be exercised by the physicians, Drs. Retik and Sher, the judge followed the leading case of *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968). He said, in effect, that a physician was held to the exercise of professional judgment at a level of competence which did not fall below the average for physicians of the given specialty at the time (a formula to be properly accommodated to the case of a physician completing a residency). Evidence that a particular physician, charged with malpractice, had prescribed a treatment different from that which other physicians, assumed to be competent, would advise, was not itself proof of his negligence; the question was whether his prescription represented a competent professional judgment, as explained. A physician (except by special contract) did not guarantee a cure of the patient's condition or even an improvement of it, but he must act competently, again as explained. In the context of the foregoing instructions, the judge said, "If he makes a mistake in his judgment, in the exercise of his judgment, the plaintiff cannot recover." This was objected to. The remark was wrong if taken to mean that a physician was not chargeable with any mistake of judgment made by him in good faith (a subjective standard). The remark was right when "judgment" is taken as a shorthand reference back to the competent professional judgment described in the *Brune* case (an objective standard): a physician making such a judgment could not be held liable even if it turned out to be a mistake, that is, yielded a poor result. That invocation of a subjective standard would be erroneous but reference to an objective standard would be correct, is shown by comparing *Ellis* v. *Springfield Women's Clinic*, 67 Or. App. 359, 362 (1984), and *Shamburger* v. *Behrens*, 380 N.W. 2d 659, 663 (S.Dak. 1986), with *Ouellette* v. *Subak*, 391 N.W. 2d 810, 815 (Minn. 1986).[7] The judge would have done better

_____

[7] Although not sharply taken, the distinction appears to be implicit in *Riggs* v. *Christie*, 342 Mass. 402, 406 (1961); *Barrette* v. *Hight*, 353 Mass.

to spell out the point. We think, however, that jurors who had heard the whole case, and received the judge's remark in the setting of the instructions as a whole, could not have imagined that the defendant physicians could escape liability simply by being of good heart — they must conform to *Brune*.

(e) In the course of full conventional instructions on how the jury should appraise the testimony of experts, the judge put as a question, among others, for the jury to consider: "What experience and training does he [the expert] have in treating a two and a-half year old child with a serious kidney infection?" The plaintiff argues that this was a violation of G. L. c. 231, § 81,[8] a forbidden comment by the judge on the evidence in the sense of suggesting that the judge had a low evaluation of Dr. Martino, the plaintiff's expert. What evidently troubled the plaintiff's counsel was that the jury might be led to reflect upon the fact that Dr. Martino's practice in nephrology was largely with adult patients, although he had treated children as well, whereas Dr. Grupe was a specialist in pediatric nephrology and there was testimony for the defense that this was a distinct specialty. It is not, however, a function of instructions about experts to declare that they are all created equal. Fair questions for the attention of the jury — which need not be pitched at an exalted level of generality — may lead them to prefer one expert to another. If the plaintiff can complain of the quoted question, might the defense complain (it did not) of a further consideration that the judge put to the jury: Did the expert have any (extraneous) bias? Dr. Grupe, it will be remembered, was a colleague of Dr. Retik at Children's Hospital, besides having been aligned in interest with Dr. Retik in the present action before he was dismissed as a party. The judge did not overstep the line of neutrality in either instance. Cf. *Hohman* v. *Hemmen*, 280 Mass. 526, 529 (1932); Nolan, Civil Practice § 756 (1975). We should add that the judge made clear the jury were sovereign as to the facts and inferences

---

268, 275 n.7 (1967); *Brune* v. *Belinkoff*, 354 Mass. at 109; *Schwartz* v. *Goldstein*, 400 Mass. 152, 155 (1987).

[8] "The courts shall not charge juries with respect to matters of fact, but they may state the testimony and the law."

therefrom and they were to disregard any inadvertent intimations by the judge of his appraisal of the evidence. Cf. *Barrette* v. *Hight*, 353 Mass. 268, 270-271 (1967).

5. The direction at the close of the plaintiff's evidence in favor of Dr. Stellin should not be disturbed. Apart from having acted as the admitting physician, she was not shown to have taken any such part in the care of Julianne as might expose her to a charge of negligence. She was at most a third or fourth string player. Further, it would be anomalous to reverse the direction in her case when the verdicts in favor of Drs. Retik and Sher covering the issue of negligence are being upheld.

Dr. Sher under Dr. Retik's supervision entered the orders for the application of gentamicin and was apparently more active in Julianne's case than Dr. Stellin chanced to be. However, he was not shown to stand in such a relation to the parents that he would be bound to inform them of the risks; that duty belonged clearly to Dr. Retik as the attending physician. See *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152, 158-159 (1982); *Halley* v. *Birbiglia*, 390 Mass. 540, 548-549 (1983).

Accordingly, at the close of all the evidence, the judge rightly directed a verdict in Dr. Sher's favor on the issue of informed consent. Further, it would be anomalous to reverse this direction when the verdict in Dr. Retik's favor embraces the issue of informed consent as well as the issue of negligence.

*Judgments affirmed.*