Donna Marie **WALTON**, Administratrix of the Estate of Curtis Walton, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. A. No. 88–0066–F.

United States District Court, D. Massachusetts.

Jan. 24, 1991.

Marvin K. Rasnick and Greg T. Schubert, Proctor, Rasnick & Goewey, Worcester, Mass., for plaintiff.

Marybeth Carmody, Asst. U.S. Atty., Boston, Mass., for defendant.

## OPINION

FREEDMAN, Chief Judge.

### I. INTRODUCTION

This is a medical malpractice case brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, by plaintiff Donna Marie Walton, administratrix of the estate of Curtis Walton, against the United States of America.

Plaintiff alleges that Frank M. Sikora, a dentist at the Veterans Administration Hospital in Northampton, Massachusetts ("Northampton VA"), was negligent in that he administered Xylocaine as a local anesthetic in combination with epinephrine during a dental procedure performed on Curtis Walton. Mr. Walton was in need of extensive dental work and his care was complicated by a long history of hypertension, which is the elevation of systolic and/or diastolic blood pressure. Epinephrine is adrenalin and is used as a vasoconstricting drug to reduce the diameter of blood vessels in the area to which it is administered. Epinephrine can also cause the elevation of a person's blood pressure. Plaintiff alleges that the use of epinephrine in Curtis Walton's case was a departure from good and acceptable medical practice, and was the proximate cause of Curtis Walton's death.

The plaintiff's case was tried to the Court on December 3, 5 and 6, 1990. Having heard the evidence and arguments in the case, the Court makes the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. Curtis Walton was born on March 15, 1947 and served in the United States Army from June 16, 1965 until August 8, 1971, when he was honorably discharged due to a medical disability that included hypertension and headaches.

2. On August 10, 1975, Curtis Walton married the plaintiff with whom he had two children, Alfa Omega Walton and Curtis Walton Jr. Curtis Walton was not the biological father of Donald Maurice Garner, who was born to the plaintiff on December 29, 1971.

3. Curtis Walton was also the father of Marquis Walton, born January 25, 1982, whose mother is Cheryl Dozier of Columbus, Georgia.

4. On or about June of 1981, Curtis Walton had a subarachnoid hemorrhage, secondary to a carotid artery aneurism. On July 9, 1981, a craniotomy with microscopic clipping of the aneurism was performed on Curtis Walton at a hospital in Columbus, Georgia. Thereafter, Mr. Walter developed seizure disorder.

5. During the year 1982, Curtis Walton was treated several times for hypertension at the Phenix City Hospital in Alabama.

6. On September 17, 1982, Curtis Walton was first treated at the Veterans Administration Outpatient Clinic in Springfield, Massachusetts for "sky high blood pressure."

7. From 1982 until July 1985, Curtis Walton was treated on a regular basis at the Springfield Outpatient Clinic, where he was closely monitored for hypertension, seizure disorder and headaches. He was treated by Dr. Burton Shayevitz, an inter-

nist/cardiologist and Dr. Iosif Tonkonogy, a neurologist.

8. From December 12, 1982 until January 7, 1983, Curtis Walton was admitted to the Northampton VA for treatment of his seizure disorder, hypertension and headaches. During this admission, Mr. Walton was treated by both Drs. Shayevitz and Tonkonogy.

9. During the Northampton VA admission, Curtis Walton was also evaluated by Dr. Frank M. Sikora, the dentist who later administered the anesthetic which plaintiff alleges as the cause of Curtis Walton's death. At the outset of this doctor-patient relationship, Dr. Sikora performed an oral cancer screening and a general dental examination of Curtis Walton and advised him that he had several cavities that needed attention, as well as gingivitis and periodontal disease.

10. During the same admission, Curtis Walton was medically cleared to obtain dental treatment by Dr. Burton Shayevitz. Curtis Walton had several dental procedures performed while an inpatient on December 22, 27, 29 and 30, 1982. During each of these procedures Curtis Walton was injected with a local anesthetic, Xylocaine with 2% epinephrine in 1–100,000 concentration. Curtis Walton did not have any adverse reaction to the local anesthetic used during any of these procedures.

11. During the admission, Curtis Walton also had an electrocardiogram done which indicated that he had left ventricular hypertrophy of the heart, which is evidence of longstanding hypertension.

12. Curtis Walton was again admitted to the Northampton VA on February 15–18, 1983. During that admission, he was treated for hypertension and seizure disorder.

13. From February 23 until March 9, 1984, Curtis Walton was again admitted to the Northampton VA. On March 5, 1984, Mr. Walton had another dental procedure performed by Dr. Green, a dentist at the Northampton VA. Dr. Green filled and treated tooth # 8, which was fractured. Although there is no indication in the medical record whether or what local anesthetic

was given to Mr. Walton on this occasion, Dr. Sikora testified that this procedure would not ordinarily be performed without using a local anesthetic. The anesthetic usually administered at the Northampton VA for that procedure was Xylocaine with 2% epinephrine in 1–100,000 concentration. There is no indication in the record that Mr. Walton had any adverse reaction as a result of the procedure performed on March 5, 1984.

14. On March 6, 1984, plaintiff made an application for a life insurance policy on the life of Curtis Walton with Massachusetts Mutual Life Insurance Co. That application was signed by plaintiff, who had been a nursing assistant since 1979. The application denied that Mr. Walton had any history of convulsions, headaches, high blood pressure or seizure disorder. It also denied that Mr. Walton had received any medical treatment, been hospitalized, had an electrocardiogram, x-rays or other diagnostic tests within the prior five years. Plaintiff met with the agent and supplied the answers to these questions. This application was completed while Curtis Walton was an inpatient at the Northampton VA.

15. Although plaintiff testified at trial that it was not her idea to obtain the insurance policy and also that she did not supply the answers to these medical questions to the agent, she testified at deposition in a state court action to rescind the insurance policy that, in fact, it was her idea to obtain the life insurance policy.

16. On April 10, 1984, the medical records indicate that Curtis Walton called the Dental Clinic at the Northampton VA and spoke to the Chief of Dental Services at that time, Dr. James House. The record indicates that Curtis Walton inquired whether he could obtain dental treatment on an outpatient basis for a fracture of tooth # 8 at the Northampton VA. The record reflects that Dr. House advised Curtis Walton that he was not eligible for outpatient treatment because the needed dental work was less than 100% service connected. Dr. House advised Mr. Walton that the only way he could obtain outpatient dental treatment at the VA was to

have his medical doctor, Dr. Shayevitz, state in writing that his dental condition was causally connected to his medical disability. According to the note of Dr. House, Mr. Walton because frustrated and told him to "just forget it."

17. On April 12, 1984, Curtis Walton was examined at a clinic at the Northampton VA by a physician's assistant who completed the adjunct authorization for Mr. Walton. The authorization stated that Mr. Walton fractured his tooth as a result of a seizure. As a result, Mr. Walton was entitled to be treated for that tooth on an outpatient basis.

18. On April 12, 1984, Dr. House treated Curtis Walton's fractured tooth. During the procedure, Mr. Walton was given a local anesthetic, Xylocaine with 2% epinephrine in 1–100,000 concentration. Curtis Walton did not have an adverse reaction to that injection.

19. From December 6, 1984 until January 4, 1985, Curtis Walton was again admitted to the Northampton VA. During this admission he was given both an EKG and an exercise stress tolerance test. These tests again showed that Curtis Walton had left ventricular hypertrophy, but did not indicate any other abnormality of his heart.

20. On February 22, 1985, Curtis Walton visited the Dental Clinic at the Northampton VA. Curtis Walton spoke with Dr. House who wrote the following note in the record:

Patient came today complaining that # 8 incisal edge filling came out. He was questioned at length about why he did not have root canal therapy done by a private dentist as he told us he would do 3–5–84. He said he did go to a private dentist in Springfield. That dentist took x-rays and told this patient that he did not need a root canal filling # 8. Further questioning reveals *this patient often experienced a "boil" developing on his palate* behind # 8 or on labial fold area anterior to # 8 which gets very sore and finally bursts with exit of "a lot of puss." Another apical x-ray was taken today of # 8. It shows the same size

radiolucency at apex of # 8 as was there in our previous x-ray taken 3–5–84. I made a drawing for him and spent 20 minutes explaining what a root canal filling is and its purpose. I also told him he has *advanced periodontal disease* and it is my opinion that he should have the remaining upper teeth extracted and an upper denture constructed. He agreed with that assessment but left not stating what he planned to do.

Medical Record at 126 (emphasis added).

21. Dr. Sikora testified that in his experience and medical opinion, the dental condition which Dr. House detailed in his note on February 22, 1985 would not improve without dental intervention and extractions.

22. During the week before July 8, 1985 while at his home, Curtis Walton advised Mary Elaine Smith, a friend of his wife's, that he was going into the hospital to "have his mouth fixed."

23. On or about July 8, 1985, Curtis Walton was again admitted to the Northampton VA for the stated reason that he was in need of treatment for exacerbation of a recurrent seizure disorder and severe hypertension. However, Mr. Walton's comment to Mary Elaine Smith and Dr. House's notes in the dental record regarding the eligibility requirements for outpatient dental treatment indicate that Curtis Walton wanted to be admitted to the hospital in July of 1985, in order to qualify for dental treatment that he could not receive as an outpatient.

24. During the morning of July 10, 1985, Curtis Walton was examined on Ward B by Dr. House in a routine oral cancer screening procedure. On that oral screening sheet, Dr. House noted that no treatment was indicated.

25. During the afternoon of July 10, 1985, Curtis Walton appeared at the Dental Clinic and requested that his top teeth be extracted and replaced with a denture. Both Dr. House and Dr. Sikora spoke with Curtis Walton during this visit. Dr. House contacted Curtis Walton's attending physician, Dr. Tonkonogy, to obtain medical

clearance for the dental extractions to be performed. Dr. Tonkonogy approved the extractions, but requested that only two teeth at a time be extracted to keep Mr. Walton's level of stress to a minimum.

26. Dr. Sikora discussed with Curtis Walton the order in which Mr. Walton would like his teeth removed. Mr. Walton requested that his front teeth be extracted last, for appearance sake. Mr. Walton elected to have teeth numbers 1 and 2 extracted first, then tooth number 14 (a molar), and finally his front teeth. The extractions were planned to begin on July 16, 1985, which was the first open appointment on Dr. Sikora's schedule. Dr. Sikora explained to Curtis Walton exactly how the procedures would be performed.

27. On July 10, 1985, Dr. Tonkonogy signed the written approval for dental treatment and noted in the progress notes that Curtis Walton had "no new seizure episodes."

28. On July 11, 1985, Dr. Sikora had a cancellation at 2:30 p.m. Curtis Walton was available and was summoned to the Dental Clinic for his first two extractions. Dr. Sikora testified in detail as to the procedure he followed from the time Curtis Walton arrived at the Dental Clinic until he left.

29. Dr. Sikora administered two carpules (3.6cc's) of Xylocaine with 2% epinephrine in 1–100,000 concentration to Curtis Walton. He waited approximately five minutes for the anesthetic to take effect, then extracted teeth numbers 1 and 2. Dr. Sikora testified that the procedure was routine, that is, without any complications and took approximately twenty minutes to perform. After the procedure, Dr. Sikora gave Curtis Walton detailed instructions to follow and told Curtis Walton that if he encountered any difficulty after the procedure to report it to the medical staff.

30. The record indicates that following the procedure on July 11, 1985, Curtis Walton did not make any complaint of any seizure or report any other reaction to the medical or dental staff at the Northampton VA.

31. On the evening of July 11, 1985, plaintiff and her family arrived at the Northampton VA to visit. Mrs. Walton testified that she took Curtis Walton to a McDonalds restaurant in Northampton for dinner with their children. Mrs. Walton testified that when she arrived at the Northampton VA she observed that Curtis Walton looked fine.

32. The medical record for the period between July 11–16, 1985 reflects no complaints by Curtis Walton to any of the medical or dental staff at the Northampton VA regarding any seizure or other reaction to the local anesthetic used during the dental procedure on July 11, 1985.

33. On July 12, 1985, Curtis Walton was given Tylenol for a complaint of headache and toothache from extractions.

34. On July 16, 1985, Dr. Tonkonogy noted in the medical record that Mr. Walton had not had any new seizure episode.

35. On the morning of July 16, 1985, Mr. Walton spoke with Mary Sikoski, a registered nurse who worked on Ward B at the Northampton VA and who was familiar with Mr. Walton's condition. Curtis Walton and Mrs. Sikoski had a friendly nurse-patient relationship that developed during the course of Mr. Walton's several admissions to the Northampton VA, where he was always assigned to Ward B.

36. Mrs. Sikoski and Mr. Walton were both fans of a television soap opera. As part of their friendship, Mr. Walton would advise Mrs. Sikoski on a daily basis, of the events occurring on the soap opera.

37. On the morning of July 16, 1985, Mr. Walton advised Mrs. Sikoski that he would not be able to let her know what was happening on the soap opera that day as he had a dental appointment at 12:45 p.m. Mr. Walton did not voice any complaints to Mrs. Sikoski at that time regarding the prior dental procedure, nor did he voice any fears regarding the upcoming procedure.

38. Dr. Sikora followed his usual procedures when Curtis Walton reported to the Dental Clinic on July 16, 1985. During his pre-treatment interview with the patient, he asked Curtis Walton whether he had

suffered any problems after the extractions on July 11, 1985. Curtis Walton told Dr. Sikora that he had no problems after that procedure.

39. At approximately 12:45 p.m. on July 16, 1985, Dr. Sikora administered one carpule (1.8cc's) of Xylocaine with 2% epinephrine in 1–100,000 concentration to Curtis Walton and extracted one tooth. Mr. Walton made no complaints to Dr. Sikora either before, during, or after the extraction. After the procedure, Curtis Walton walked back to Ward B.

40. At approximately 1:45 p.m. on July 16, 1985 Curtis Walton complained of facial tremors. He told the nursing staff on Ward B that he was "not feeling well." He also complained of chills, fever and dizziness. He was then transferred to the area of Ward B for more seriously ill patients, where his blood pressure was taken and an IV line was inserted. His blood pressure then rose to 172/120 and later to 208/132. Dr. Tonkonogy was called, but was not available. Dr. Shayevitz, who had not previously treated Mr. Walton during this admission, was on the Ward and was called to attend Mr. Walton.

41. Dr. Shayevitz is the Director of Intensive Care at the Northampton VA and has been board certified in internal medicine for the past twenty-six years. Dr. Shayevitz was told by a nurse that Curtis Walton had a reaction to the local anesthetic which had been administered to him during a dental extraction. Dr. Shayevitz was not told at that time either the amount of the local anesthetic that was administered, or the time delay between the administration of the anesthetic and the onset of symptoms.

42. Dr. Shayevitz was familiar with Mr. Walton's previous history of hypertension, aneurism and seizure disorder. Dr. Shayevitz ordered that Mr. Walton be administered nifedipine sublingually to bring down his blood pressure, which was over 240 when he first examined him. He then ordered Mr. Walton to be transferred to the Intensive Care Unit ("ICU"). He noted on the transfer note an initial assessment that Curtis Walton had suffered a "reaction to Adrenaline and Xylocaine." Medical Record at 415.

43. In the ICU, Mr. Walton stabilized somewhat and his blood pressure came down for a time. At approximately 2:30 p.m., his wife was called and advised to come to the hospital. She arrived at approximately 3:30 p.m.

44. Curtis Walton's blood pressure again became elevated and he lost sensation in his extremities and developed abnormal cardiac rhythms. At approximately 4:00 p.m. Mr. Walton went into cardiac arrest. The medical staff attempted to resuscitate him, and tried to insert a pacemaker. Medical Record at 404–08. Despite all efforts to save him, Curtis Walton was pronounced dead by Dr. Shayevitz at approximately 5:08 p.m. Medical Record at 441.

45. Dr. Shayevitz and Donna Walton testified as to conversations they had when she arrived at the hospital on July 16, 1985. Mrs. Walton testified that Dr. Shayevitz told her that Curtis had a "reaction to the Novocaine" and that a different kind of Novocaine had been used on Curtis Walton during the dental procedure that day. Dr. Shayevitz testified that he did not discuss "Novocaine" with Mrs. Walton, and that he did not have any knowledge of an alleged reaction of Mr. Walton to a local anesthetic during an earlier tooth extraction.

46. Dr. Shayevitz did not have an opinion, to any reasonable degree of medical certainty, as to the cause of Curtis Walton's death on July 16, 1985. Dr. Shayevitz reviewed the facts, including the delay between the administration of the local anesthetic and the symptoms exhibited by Curtis Walton following the dental appointment. Upon reflection, Dr. Shayevitz could not conclude that Mr. Walton had a "reaction" to Xylocaine with epinephrine.

47. An autopsy was performed on Curtis Walton by Dr. Elizabeth Robbins of the VA staff, at the request of the medical examiner. The exact cause of death could not be determined. The autopsy showed that Curtis Walton had left ventricular hypertrophy and renal cortical adenoma, conditions which were consistent with long-

standing hypertension. Medical Record at 446–53. Dr. Robbins did not have an opinion, to any reasonable degree of medical certainty, as to the cause of Curtis Walton's death.

48. Dr. Adolph Meltzer, a general surgeon who has been licensed to practice medicine since 1938, testified as plaintiff's expert. Dr. Meltzer is not a dentist but stated he has "done plenty of operations in the mouth." Fifty-five percent of Dr. Meltzer's practice concerns patients with cancer, twenty-five percent of his practice deals with gynecological problems and twenty percent with surgical patients. Of the surgical patients treated by Dr. Meltzer, only five percent of the surgery related to the face and neck. Dr. Meltzer has never performed a dental procedure and has never extracted a tooth. He is also not board certified in cardiology. He stated that the use of Xylocaine with epinephrine is contraindicated in patients suffering from hypertension or coronary disease. He opined that the epinephrine started a chain reaction, causing Curtis Walton's blood pressure to rise, disrupting the rhythm of his heart, and ending in cardiac arrest.

49. Dr. Meltzer acknowledged that the human body produces adrenalin when it is subjected to pain. But Dr. Meltzer declined to state an opinion regarding whether the minimization of pain would reduce the amount of adrenalin produced naturally by a patient's body. Dr. Meltzer stated that a patient could be given repeated injections of Xylocaine without epinephrine in order to complete a dental procedure.

50. Dr. William Lane, an oral surgeon testified as an expert for the defendant, United States. Dr. Lane is a graduate of Harvard College and Boston University School of Dentistry. After his internship and residency, he entered the private practice of dentistry in Massachusetts in 1981.

51. Dr. Lane reviewed the complete medical records of Curtis Walton and testified that it was not a breach of the standard of care of dentistry in Massachusetts in 1985 to administer Xylocaine with 2% epinephrine in 1–100,000 concentration to a patient with the medical history of Curtis Walton. Dr. Lane noted that Curtis Walton had received the local anesthetic seven times previously, all without incident.

52. Dr. Lane testified at length concerning the nature and the uses of local anesthetics in dental procedures. He explained that in order to gain more profound anesthesia, that is, to retain the anesthetic at the site of the dental procedure to be performed long enough to perform the procedure, epinephrine (adrenaline) is essential. Dr. Lane explained that in order to minimize pain, a dentist must anesthetize the pulp of the tooth. The duration of pulpal anesthesia using a local anesthetic without epinephrine is approximately five minutes. A dental extraction may require fifteen to thirty minutes. Dr. Lane explained the accepted fact that when the local anesthetic is combined with epinephrine (which acts as a vasoconstrictor), it stays at the site of the procedure for approximately sixty minutes.

53. Dr. Lane further testified that when treating a patient with hypertension, the key is to keep the amount of pain to a minimum. Pain causes stress, which in turn causes an increase in blood pressure. Thus, it is important when performing a dental procedure on a patient with hypertension, to ensure that pain is minimized.

54. Dr. Lane testified that he reviewed the dental care received by Curtis Walton at the Northampton VA in July of 1985 and stated that in his opinion, there was no breach of the standard of care in the field of dentistry by Dr. Sikora.

55. Dr. Lane also testified that any reaction to the administration of the local anesthetic would have been immediate. He stated that the onset of the local anesthetic is less than two minutes. The reaction of the blood pressure to the administration of Xylocaine with epinephrine would not be delayed by approximately one hour, but would commence immediately upon administration. Therefore, Dr. Lane concluded that in his opinion, the symptoms that Curtis Walton exhibited at approximately 1:45 p.m. on July 16, 1985, were not causally connected to the dental procedure per-

formed and the administration of the local anesthetic at 12:45 p.m. that day.

56. Dr. Lane testified that reactions to Xylocaine with epinephrine are extremely rare. The usual reaction would not be to the adrenaline, which is naturally produced in the body during times of stress, but would be to the preservative which is included in the local anesthetic. Furthermore, the clinical manifestations of an allergic reaction to the preservative would exhibit symptoms different from those experienced by Curtis Walton on July 16, 1985.

57. In addition, Dr. Lane testified that the amount of epinephrine contained in the local anesthetic that Curtis Walton received was minuscule. It is the amount of epinephrine produced by a one-hundred-pound person at rest. He opined that the administration of such a small amount of epinephrine would not cause the increase in blood pressure experienced by Curtis Walton on July 16, 1985, one hour after administration of the anesthetic.

58. Based upon his review of the medical records, including the autopsy, Dr. Lane did not have an opinion, to a reasonable degree of medical certainty, as to the cause of Curtis Walton's death.

59. Dr. Richard Wolff, an internist and board certified cardiologist also testified as an expert witness for the defendant, United States. Dr. Wolff testified that he regularly treats patients with hypertension, which is a cardiovascular disease. In that regard he is often consulted by dentists to determine whether his patients are medically capable of undergoing dental treatment.

60. Dr. Wolff testified that when he is contacted by a dentist, his usual procedure is to inquire as to the procedure to be done and the amount of anesthetic to be administered. If the patient's blood pressure is under control, there is no contraindication to undergoing a dental procedure. Generally, Dr. Wolff cautions the dentist to use the smallest possible amount of local anesthetic. He does, however, allow the use of the anesthetic to keep the stress level to a minimum.

61. Dr. Wolff stated that he had reviewed the medical records of Curtis Walton and that in his opinion, there was no contraindication to the administration of 1.8cc's of Xylocaine with epinephrine in the amount and concentration which was administered to Curtis Walton.

62. Based on his review of the medical record, including the autopsy, Dr. Wolff did not have an opinion, to a reasonable degree of medical certainty, as to the cause of Curtis Walton's death on July 16, 1985.

63. In a written argument submitted to this Court, plaintiff's counsel states that this case is "reminiscent of the film 'Deer Hunter,'" a violent movie in which a veteran is goaded into risking suicide in a game of "Russian Roulette." By way of analogy, plaintiff's counsel suggests that Drs. Sikora, Tonkonogy and the other health care professionals at the Northampton VA were toying with Curtis Walton's life during the course of Mr. Walton's treatment for hypertension and extensive dental problems and, therefore, that they breached the standard of care and were negligent in treating Mr. Walton.

### III. CONCLUSIONS OF LAW

1. In an action for negligence under the Federal Tort Claims Act, the substantive law to be applied is that of the state where the wrongful act or omission occurred. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Therefore, Massachusetts medical malpractice law applies. In Massachusetts, "[t]he essence of a complaint of medical malpractice is that the physician engaged by the plaintiff departed from 'the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession.'" *Johnston v. Stein*, 29 Mass.App.Ct. 996, 998, 562 N.E.2d 1365, 1367 (1990), *quoting Brune v. Belinkoff*, 354 Mass. 102, 109, 235 N.E.2d 793 (1968). The Court finds that there was no breach of the standard of care in the medical and dental treatment rendered to Curtis Walton at the Northampton VA in July 1985. Rather, the Court finds that

Dr. Sikora and his fellow doctors and nurses at the Northampton VA held to a high standard of care in treating Curtis Walton's complex medical condition. Curtis Walton was in need of extensive dental work, and the health care professionals at the Northampton VA provided the needed care, and were mindful and sensitive to Curtis Walton's hypertensive condition. In so doing, the doctors and nurses exhibited a genuine concern for Mr. Walton's physical and emotional well-being. Mrs. Walton was also treated with sensitivity and respect.

2. In view of the standard of care existing in Massachusetts in July 1985, the administration of Xylocaine with 2% epinephrine in 1–100,000 concentration to a patient with Curtis Walton's complex medical history was not contraindicated. The Court does not find that entries in the Physicians' Desk Reference ("PDR") cited by plaintiff's counsel support the assertion that the standard of care was breached in this case. Even if these entries were interpreted in the manner plaintiff urges, the PDR, standing alone, does not amount "to an absolute rule of conduct" or the only standard by which the conduct of a physician or dentist is measured. *Grassis v. Retik, et al.*, 25 Mass.App.Ct. 595, 598, 521 N.E.2d 411, 414 (1988). Similarly, the manufacturer's package insert concerning the administration of Xylocaine with epinephrine to hypertensive dental patients does not establish a breach of the standard of care in this case. "Courts have generally stated that medical pamphlets, brochures, or instruction sheets published by drug manufacturers [are] not to be used as independent evidence" but may be taken into consideration by the trier of fact "along with other evidence in determining the issue of malpractice." Annotation, *Medical Books or Treatises as Independent Evidence*, 84 A.L.R.2d 1338, 1350 (1962).

3. "In a medical malpractice action, the plaintiff bears the burden of proving the causal connection between the physician's negligence and the plaintiff's injuries." *Held v. Bail*, 28 Mass.App.Ct. 919, 920, 547 N.E.2d 336, 337 (1989). The trier of fact "may not speculate about the possible results of administering or withholding particular therapy. Thus, ... if the causation question involves questions of medical science or technology, the [trier of fact] requires the assistance of expert testimony." *Id.* at 921, 547 N.E.2d at 337–38 (citations omitted). The Court finds that plaintiff has not established a causal connection between the administration of Xylocaine with epinephrine to Curtis Walton on July 16, 1985 and Curtis Walton's death later that day. The causal link "generally must be established by expert testimony that the injury was more probably than not a result of the physician's negligence." *Harlow v. Chin, et al.*, 405 Mass. 697, 702, 545 N.E.2d 602, 605 (1989). Drs. Lane, Wolff, and Robbins testified that the cause of Curtis Walton's death could not be determined. The Court does not credit the expert opinion of Dr. Meltzer that the death of Curtis Walton was the result of a delayed reaction to the epinephrine administered by Dr. Sikora, or to a chain reaction started by the epinephrine.

4. In reaching the conclusions regarding the standard of care and causation issues, the Court credits the testimony of the experts who testified on behalf of the United States, Drs. Lane and Wolff. The training and experience of a practitioner may be considered by the finder of fact in determining the weight to be accorded the practitioner's testimony. *Letch v. Daniels*, 401 Mass. 65, 69, 514 N.E.2d 675, 677 (1987). Dr. Lane exhibited a knowledge and experience in the field of dentistry and, particularly, the administration of local anesthetics that was superior. Likewise, the testimony of Dr. Wolff exhibited a knowledge and experience in the field of cardiology that was superior. The Court gives little weight to Dr. Meltzer's opinion that the standard of care was breached in this case and that the use of epinephrine in combination with a local dental anesthetic was contraindicated. Dr. Meltzer's limited expertise regarding the field of dentistry was diminished by his own admission that he was only "vaguely" familiar with the structure of a tooth, and that in his professional practice it was "not necessary" for

him to know that the pulp of a tooth must receive anesthesia for the duration of a dental procedure. Additionally, when the defendant United States cited a joint protocol published by the American Heart Association and the American Dental Association in March 1964 which stated that the concentrations of vasoconstricting drugs used with local anesthetics during dental procedures were not contraindicated for hypertensive patients, Dr. Meltzer opined that this protocol was outdated. However, when shown an article published in the Journal of the American Dental Association in 1989 which addressed the controversy over the use of epinephrine in combination with local dental anesthesia and concluded that local use of epinephrine was acceptable in dental patients with cardiac disease, Dr. Meltzer stated simply that he does not read "dentists' reports."

## IV. CONCLUSION

Judgment is entered for the defendant, the United States of America.

It is So Ordered.