Vincente ROSARIO, Richard Rosario,
and Epifania Nieves, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 86–2017–N.

United States District Court,
D. Massachusetts.

May 10, 1993.

M. Robert Dushman, Brown, Rudnick, Freed & Gesmer, Boston, MA, for plaintiffs.

Suzanne E. Durrell, Countess C. Williams, U.S. Attorney's Office, Boston, MA, for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

DAVID S. NELSON, Senior District Judge.

### I. INTRODUCTION

This is a medical malpractice action brought by Vincente Rosario, Richard Rosario, and Epifania Nieves against the United States of America pursuant to the Federal Tort Claims Act. Vincente Rosario alleges that he sustained permanent injuries as a result of the negligent care provided to him by the Jamaica Plain Veterans' Administration Medical Center ("VA" or "Hospital") in connection with an arteriogram he received on January 28, 1985. Epifania Nieves, Vincente Rosario's mother, seeks damages for

the loss of filial consortium as a result of Mr. Rosario's injuries.[1]

This case was tried before the Court, sitting without a jury, for seven days in August, 1991. Pursuant to the Court's instructions, the parties filed post-trial briefs and proposed findings of fact and conclusions of law.[2] Having now fully considered the stipulations of law and fact, the testimony of all witnesses, and the evidence admitted at trial, this Court finds that Plaintiffs have failed to prove by a preponderance of the credible evidence that the treatment Mr. Rosario received at the VA was below the applicable standard of care imposed by law. In addition, since Plaintiffs have not proven by a preponderance of the credible evidence that Mr. Rosario was dependent on Mrs. Nieves for financial support, her claim for loss of filial consortium must likewise fail. Therefore, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and for the reasons set forth in the following Findings of Fact and Conclusions of Law, this Court enters final judgment in favor of Defendant, the United States of America.

## II. FINDINGS OF FACT

After experiencing stroke-like symptoms on January 18, 1985, Vincente Rosario, a resident of Boston, Massachusetts, was admitted to the Veterans' Administration Medical Center in Jamaica Plain, Massachusetts. He was 51 years old at the time. When admitted to the Hospital, Mr. Rosario indicated that, beginning the previous afternoon, he was experiencing pain in his neck and right arm, weakness in his right arm and leg, and difficulty in speaking. Mr. Rosario's medical history revealed that, in addition to having had a heart attack in June 1983, he suffered from chronic obstructive pulmonary disease, high blood pressure, alcoholism, and cervical degenerative joint disease of the spine with a narrowing at the C5–C6 and C6–C7 levels.[3] Moreover, Mr. Rosario had smoked two packages of cigarettes a day for thirty years.

After taking the medical history, physicians at the Hospital, headed by Dr. Alan del Castillo, a senior resident of neurology,[4] conducted several tests intended to assist in the making of a preliminary diagnosis. Those tests included a full neurological exam, conducted by Dr. del Castillo,[5] and an unenhanced CAT-scan. The doctor's neurological exam of Mr. Rosario focused on the patient's mental status with respect to his intellect, memory and language skills. The doctor also examined Mr. Rosario's cranial nerves, muscular system, tendon reflexes, sensory system, and cerebellar system. While the

---

1. When originally filed, the complaint in this case contained a loss of parental consortium claim for Richard Rosario, Vincente Rosario's adult son. See Complaint, filed July 8, 1986, Docket No. 1, at 5 (Count III). However, with respect to that claim, this Court granted Defendant's motion for partial summary judgment, concluding that Richard Rosario's claim was barred by the doctrine of collateral estoppel:

 Richard Rosario's claim for loss of consortium, which derives from his father's injury, was actually litigated and finally adjudged by a state court of competent jurisdiction by virtue of its dismissal on directed verdict. This court must therefore give that judgment preclusive effect, barring Count III of the complaint in this case.

 Memorandum and Order, Dated May 9, 1991, Docket No. 65, at 9 (citation omitted). Richard Rosario's claim for loss of parental consortium was accordingly dismissed and is therefore no longer before this Court.

2. Proposed Findings of Fact and Conclusions of Law of Vincente Rosario, Richard Rosario, and Epifania Nieves, filed September 17, 1991, Docket No. 79; Post–Trial Brief of Vincente Rosario, Richard Rosario, and Epifania Nieves, filed September 17, 1991, Docket No. 80 (hereinafter "Plaintiffs' Brief"); Substitute Proposed Findings of Fact and Conclusions of Law of the United States of America, filed September 17, 1991, Docket No. 81 (hereinafter "Defendant's Proposed Findings and Conclusions"); Post–Trial Brief of the United States of America, filed September 17, 1991, Docket No. 82.

3. The letter "C" in C5–C6 and C6–C7 refers to "cervical spine disc."

4. Dr. del Castillo was licensed to practice medicine in England in 1980. In order to satisfy the requirements for obtaining a medical license in the United States, he enrolled in the Boston University Hospital Department of Neurology residency program. In January 1985, Dr. del Castillo was in the last six months of his two-year residency training.

5. By January 1985, Dr. del Castillo had performed between 1800 and 3600 neurological examinations.

motor examination indicated weakness in the patient's right arm, the neurological exam revealed that Mr. Rosario was experiencing involuntary muscle twitchings in his left deltoid (shoulder) muscle. And while the tendon reflexes were slightly more brisk on the right than on the left, the doctor was unable to elicit any tendon jerks from the heels of Mr. Rosario's feet.

Based on these results, a preliminary diagnosis of probable left middle cerebral artery stroke was made. Mr. Rosario was admitted to the neurovascular intensive care unit ("ICU") for further observation and testing. Because the preliminary diagnosis was that of a stroke, Mr. Rosario was placed on Heparin, an intravenous anticoagulant medication.

From January 19 to January 25, 1985, additional tests were conducted in an effort to further diagnose Mr. Rosario's condition and to determine the cause of the suspected stroke. One such test took place on January 21, 1985, and involved "non-invasive studies" of Mr. Rosario's carotid arteries.[6] By examining the carotid arteries, the doctors were attempting not only to determine a possible cause of the suspected stroke, but also to locate any "stenosis," a narrowing or blockage of the carotid arteries, or any ulceration in the arteries leading to Mr. Rosario's brain. The results of these tests revealed no apparent carotid artery stenosis or ulceration.

The physicians then recommended that an additional non-invasive test, known as a "carotid B–Mode study," be conducted.[7] By this time, Mr. Rosario had been transferred from the ICU to the neurological ward, Ward 6–B. The results of the carotid B–Mode

study were inconclusive as to the cause of the suspected stroke.

After receiving and studying the results of all tests performed to that point, the doctor's ordered an enhanced CAT-scan which was performed on January 25, 1985.[8] Dr. Melukote Srinivasan, a neuroradiologist and employee of Tufts New England Medical Center,[9] performed the enhanced CAT-scan. This procedure revealed a vague low density in the left parietal region of the brain. While this result was consistent with the preliminary diagnosis of a stroke, it shed little light on the potential cause.

On January 25, 1985, Dr. William Stone, an attending staff neurologist and director of the Neurovascular Unit at the VA, concluded along with Dr. del Castillo and Dr. Srinivasan. that a cerebral arteriogram should be performed on Mr. Rosario. Like the enhanced CAT-scan, an arteriogram involves the use of a contrast material to assist in visualizing certain arteries. However, with an arteriogram, the dye is injected directly into the arteries, and not the patient's arm. Once the dye is introduced, x-rays are then taken of the specific arteries or blood vessels containing the contrast material. In so doing, the treating physician attempts to locate narrowings or blockages of the arteries or blood vessels.

Mr. Rosario's arteriogram was scheduled for January 28, 1985. As was standard practice at the VA, nurses discontinued the anticoagulant medication before such a procedure. In addition, Dr. del Castillo visited Mr. Rosario during the morning of January 28th in order to obtain his informed consent

6. Located in the neck, the carotid arteries are a major source of the blood supply to the brain.

7. A "carotid B–Mode study" utilizes ultrasound to generate a two-dimensional picture of the patient's carotid arteries.

8. The "enhanced" CAT-scan differs from the "unenhanced" CAT-scan (like that conducted on January 18th) in that the former involves the injection of a contrast material, or "dye," into the circulatory system via the patient's arm in an attempt to enhance the visibility of specific blood vessels or arteries.

9. Unlike Dr. del Castillo, Dr. Srinivasan worked at the VA under independent contract. Since Dr. Srinivasan was not an "employee" of the Hospi-

tal for purposes of the Federal Tort Claims Act, he is not a party to the instant action. Plaintiffs did, however, bring a suit against Dr. Srinivasan in the Superior Court for the Commonwealth of Massachusetts, Middlesex County. See Rosario v. Srinivasan, Civil Action No. 86–4384, Complaint filed July 14, 1986, contained in Appendix to Defendant's Second Motion for Partial Summary Judgment (hereinafter "Appendix to Summary Judgment Motion"), filed February 11, 1991, Docket No. 47, at Tab "D." On April 10, 1990, a jury found that Dr. Srinivasan was not negligent in his treatment of Mr. Rosario at the VA. See Special Verdict Form, Appendix to Summary Judgment Motion, at Tab "F."

for the procedure. Since Dr. del Castillo was fluent in Spanish, Dr. Stone requested that he be the one to obtain the necessary consent.[10]

During the time when Dr. del Castillo discussed the planned arteriogram, Mr. Rosario was alert and coherent. He had not yet received any pre-arteriogram sedatives. Dr. del Castillo explained to Mr. Rosario, in Spanish, the risks of the arteriogram and the risk of paralysis. During the course of their conversation, Mr. Rosario commented that his mother, Mrs. Nieves, had warned him that the planned procedure would result in his paralysis.

In addition to the risks associated with having the procedure, Dr. del Castillo also explained the risks of not having the arteriogram. The doctor stated that, since there was a possibility of Mr. Rosario having a larger stroke in the future, the purpose of this arteriogram would be to determine if a course of treatment could be prescribed to reduce that possibility.

It was apparent to Dr. del Castillo that Mr. Rosario understood and was fully aware of the discussion the two were having about the planned arteriogram. At the conclusion of their conversation, Mr. Rosario signed the standard VA "informed consent" form and "Request for Administration of Anesthesia and for Performance of Operations and Other Procedures" form in the presence of Dr. del Castillo.

At approximately 10:35 a.m. on January 28, 1985, Dr. Srinivasan, the neuroradiologist who was to perform the arteriogram, met Mr. Rosario in the angiography suite located in the radiology department. Dr. Srinivasan described to Mr. Rosario what would happen during the arteriogram.

Just prior to the start of the procedure, a radiology nurse, Dorothy Stewart, estab-lished Mr. Rosario's "baseline" by measuring and recording his pulse, blood pressure, heart rate, alertness, speech, and known allergies. In addition, doctors took a set of x-rays of Mr. Rosario's head in order to have an initial picture of the area that was to be studied.

Since the doctors wanted to examine at least one vertebral artery and both carotid arteries, a "3-vessel" arteriogram was used. Dr. Srinivasan utilized a "right femoral" approach, which involved inserting the needle, guide wire, and catheter into the circulatory system through the right femoral artery. This artery is accessible in the patient's groin area. Before the procedure commenced, the injection site was treated with a local anesthetic.

At approximately 11:05 a.m., Dr. Srinivasan inserted the needle and guide wire into the artery and directed the wire up to the aortic arch in the direction of the carotid arteries. A 5f H1H catheter was then inserted along the guide wire to the point where the injection of the dye would take place. The contrast material being used in Mr. Rosario's arteriogram was Renografin-60.

Dr. Srinivasan decided to first study the left common carotid artery, the primary artery that supplies blood to the area of the brain where the suspected stroke-induced infarction was thought to be.[11] However, when the doctor attempted to guide the catheter into the correct position, he discovered that the catheter he was using was the inappropriate for studying the left common carotid artery. The catheter was, however, appropriate for use in examining the left vertebral artery. Since the left vertebral artery was not directly accessible from the area where the catheter was then positioned, Dr. Srinivasan had to first move the catheter into the left subclavian artery in order to gain entry into the left vertebral artery.

10. Like Mr. Rosario, Dr. del Castillo is a native of Puerto Rico. Although born in England, Dr. del Castillo moved to Puerto Rico at the age of four. He resided there until the age of fifteen. The doctor has been fluent in Spanish since the age of five, and has been called upon to act as an interpreter on many occasions during his medical career. While Mr. Rosario could speak and read English, Spanish was his native language. During Dr. del Castillo's daily visits with Mr. Rosario, the two conversed most often in Spanish. They would, however, speak English if non-Spanish speaking physicians were in the room with them.

11. An "infarction" is the death of tissue resulting from a sudden obstruction of blood circulation to a localized area, usually by a clot of some kind.

Once the catheter was located in the left subclavian artery, Dr. Srinivasan injected a small "test" amount of the Renografin–60 in order to ensure (1) that there was no stenosis at the origin, or entry point, of the left vertebral artery, and (2) that there was sufficient blood flow in the area where the arteriogram was to be performed. At 11:15 a.m., 7 cc. of the contrast material were injected into Mr. Rosario's left vertebral artery. As the contrast material flowed through the artery, a technician took a series of x-rays. The dye was in the artery for approximately three to four seconds. While Dr. Srinivasan waited for the x-rays to be developed, the catheter was removed from the vertebral artery.

Approximately two to three minutes after the catheter had been removed, Mr. Rosario's upper torso, arms, and neck began to involuntarily twitch and shake. These clonic movements lasted approximately two to three minutes. Mr. Rosario stated that he felt "electricity in his arms," adding that the same thing had happened to him about one week earlier. During this episode, Mr. Rosario remained conscious and alert. Once the movements ceased, Dr. Srinivasan immediately summoned Dr. Stone to the angiography suite.

While waiting for Dr. Stone to arrive, Dr. Srinivasan removed the catheter from Mr. Rosario and exchanged it for a different one in order to study the carotid arteries. Both the doctor and Nurse Stewart checked Mr. Rosario's vital signs, and Dr. Srinivasan conducted a cursory neurological exam. At that time, Mr. Rosario complained of weakness in his left arm.

Dr. Stone arrived in the angiography suite shortly after being called, and discussed the clonic movements with Dr. Srinivasan. Having checked Mr. Rosario's degree of alertness and language, Dr. Stone conducted a neurological examination in which he tested tendon reflexes, sensory functions, pupils, facial muscle symmetry, and strength in the arms and legs. Dr. Stone's examination of Mr. Rosario lasted between five and ten minutes.

Once the neurological examination had been completed, both doctors concluded that it was better to proceed with the arteriogram rather than risk having to repeat the procedure at a later date. Dr. Stone remained in an adjoining room for approximately five to ten minutes in order to observe whether Mr. Rosario had any further clonic movements; he then returned to the patient he had been with when called by Dr. Srinivasan.

Dr. Stone did not make a note of his visit to the angiography suite because he did not feel it was necessary to do so. Not only had he consulted with Dr. Srinivasan at length, but both doctors were fully aware of what had taken place. Moreover, since Dr. Stone was not the physician conducting the procedure, he did not write any post-arteriogram orders. The standard practice was for the neuroradiologist, Dr. Srinivasan, to write such instructions.

Dr. Srinivasan resumed the arteriogram at 11:32 a.m. by injecting 11 cc. of the contrast material into the left common carotid artery. Once he concluded his examination of this area, Dr. Srinivasan next injected another 11 cc. of the dye into Mr. Rosario's right common carotid artery at approximately 11:45 a.m. Mr. Rosario did not experience any additional involuntary movements during the remainder of the arteriogram. When the arteriogram concluded at 11:50 a.m., Mr. Rosario had normal vital signs and was conscious, coherent, and alert. He was, however, still experiencing some weakness in his left arm. Before returning Mr. Rosario to Ward 6–B, Nurse Stewart made a note in the patient record regarding the clonic movements and left arm weakness. In addition, the nurse called Ward 6–B to report on the arteriogram. Nurse Stewart wrote in her notes that the ward nurses should check the patient's left arm weakness.

The results of the arteriogram revealed that, while the vertebral and carotid arteries were normal, there was an arterio-venous malformation [12] in the left parietal lobe of the brain.

With respect to his immediate post-arteriogram condition, Dr. Srinivasan noted that

12. An arterio-venous malformation is an abnor-

mal tangling of the blood vessels.

Mr. Rosario had decreased movement of his left elbow and shoulder. The doctor prepared standard orders for Mr. Rosario's care upon his return to Ward 6–B. Those orders included checking pulse, vital signs, and bleeding at the puncture site every fifteen minutes for one hour, then every twenty minutes for two hours, and then once every hour for four hours.

Mr. Rosario was returned to Ward 6–B at approximately 12:30 p.m. The receiving nurse noted that Mr. Rosario had experienced a seizure during the arteriogram, that he was still suffering from left arm weakness, and that while movement of the shoulder was possible, the patient was unable to lift his arm. The nurse's notes in Mr. Rosario's record also indicated that "Drs. are aware of this."

At approximately 2:30 p.m., Dr. Srinivasan conferred with a neurology resident regarding Mr. Rosario's status. The resident stated that Mr. Rosario's condition had not changed since immediately after the arteriogram. Prior to leaving the Hospital on January 28th, Dr. Srinivasan again called the Ward to check on Mr. Rosario's status. He was told that the patient was experiencing weakness in his left shoulder and both legs.

The ward nurse discovered at approximately 4:00 p.m. that Mr. Rosario's blood pressure had dropped to 80/60. While it is common for a patient's blood pressure to drop following an arteriogram, the nurse nevertheless called for a doctor. Thereafter, Dr. del Castillo arrived to examine Mr. Rosario. The doctor noted that the patient had developed weakness in his arms and legs, but still had a strong grip. Moreover, Dr. del Castillo observed that Mr. Rosario was incapable of lifting either arm, and while he was able to move his right foot, there was no movement in either leg. Mr. Rosario was alert, breathing normally, and his reaction to "pin" and light touch sensation was "intact." Mr. Rosario was placed on intravenous fluids throughout the day and evening of January 28th in an attempt to raise his blood pressure.

At approximately 5:00 p.m., the ward nurse recorded Mr. Rosario's blood pressure at 84/60. Dr. del Castillo was again summoned to the Ward. The doctor conducted another neurological examination and concluded that Mr. Rosario's condition had changed little since the 4:00 p.m. exam. Dr. del Castillo noted that he was uncertain as to the cause of the patient's continued quadriparesis.[13] The doctor also stated that no neurological diagnosis could be made for the problem and that, in his opinion, the patient had normal reflexes, sensations, mental status, and cranial nerves. Although Mr. Rosario had developed weakness in all four limbs, his reflexes and tone were within normal limits and were essentially the same as they had been the day he was admitted to the VA on January 18, 1985. In the absence of other neurological findings, Dr. del Castillo concluded that the quadriparesis was a temporary condition due to a "conversion reaction."[14] Dr. del Castillo believed that the warning given to Mr. Rosario by his mother just prior to the arteriogram—that the procedure would result in his paralysis—was sufficient to trigger a conversion reaction. As a precaution, Dr. del Castillo had Mr. Rosario transferred from Ward 6–B to the neurological ICU. In addition, Dr. del Castillo ordered that Mr. Rosario's blood pressure, temperature, vital signs, "intake" (i.e., intravenous fluids, water, and food), and "output" (vomit, urine, and feces) be monitored closely.

---

13. Quadriparesis (also referred to as "tetraparesis") has been defined as "weakness of all four extremities." STEDMAN'S MEDICAL DICTIONARY 1580 (25th ed. 1990).

14. "Conversion reaction" (also referred to as "conversion hysteria") is a condition where, even though a patient actually experiences a specific symptom, the symptom has no physical or biological origin; it is due to psychological and emotional factors, not a physical illness. Conversion reaction has been formally defined as "[a] condition in which the cause of anxiety is converted into functional symptoms which may include blindness or deafness, paralysis, etc." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE C–348 (25th release 1992); see also STEDMAN'S MEDICAL DICTIONARY 757 ("[conversion hysteria is] characterized by the substitution, through psychic transformation, of physical signs or symptoms for anxiety; generally restricted to such major symptoms as blindness, deafness, and paralysis...").

Before leaving the Hospital sometime that evening between 6:00 and 6:30 p.m., Dr. del Castillo discussed Mr. Rosario's case with Dr. Barbara Stelle. Dr. Stelle, a first-year neurology resident, was on overnight duty in the ICU. Mr. Rosario was observed and examined throughout the evening of January 28th and into the early morning of the 29th by the ICU nursing staff and Dr. Stelle.[15] Specifically, the doctor issued orders regarding Mr. Rosario's treatment at 7:20 p.m., 8:30 p.m., 8:50 p.m., 11:00 p.m., and 2:40 a.m. Dr. del Castillo planned to review Mr. Rosario's condition the following morning.

Dr. Stelle conducted her own neurological examination of Mr. Rosario during the evening of January 28th. She reported that he was alert, his cranial nerves were intact, and his muscle strength throughout the upper and lower limbs was 1/5. Mr. Rosario's reflexes were recorded at a "+," except for his knees which were a "++," and the ankles were a "0." In addition, Mr. Rosario's blood pressure had risen to 100/70.

According to notes written by a ward nurse, there was no significant change in the patient's condition as of midnight on the 28th. Nurse Joseph Brosnahan was on shift in the ICU from midnight to 8:00 a.m. on January 29. Nurse Brosnahan reported that Mr. Rosario's muscle strength was 0/5 in all extremities, there was no reaction to noxious stimuli of his nail beds, there was slight shoulder mobility, and Mr. Rosario was complaining of shortness of breath. A doctor ordered oxygen for Mr. Rosario and a chest x-ray to be taken in the morning.

Since Dr. Stone was on leave from the VA on January 29th,[16] Dr. del Castillo, along with two other attending neurologists, examined Mr. Rosario that morning, between approximately 8:00 a.m. and 9:00 a.m. Mr. Rosario's blood pressure had remained at 100/70. Dr. del Castillo noted that the patient's "condition deteriorated acutely [this morning] respiratory distress." Mr. Rosario was unable to move his arms or legs and had no reaction to noxious stimuli of his nail beds.

Dr. del Castillo described Mr. Rosario's condition as "flaccid quadriparesis. No [movement] except for prox. shoulder [movement]. No withdrawal to pain." In addition, the doctor observed "[b]izarre and accelerated deterioration of neurological status—quadriparesis, sensory loss and paralysis of respiratory muscles 24 hours after angiography."

After the three physicians discussed what was happening to Mr. Rosario, two potential diagnoses were considered: "(1) Guillain–Barre—either precipitated by or coincidental to the [arteriogram] or (2) cervical cord lesion [about] C5–8." The diagnosis of conversion reaction was no longer considered a realistic possibility given the dramatic change in Mr. Rosario's physical condition. Since the patient's status was now considered a medical emergency, the first action taken was to maintain all bodily functions, including respiration. The physicians did not prescribe a course of treatment for Mr. Rosario's neurological condition because they were unsure, at that time, as to its precise state. Along with monitoring Mr. Rosario's progress, they contemplated further tests intended to assist in the making of a definite diagnosis.

By the time Dr. Stone saw Mr. Rosario on January 30th, at 8:45 a.m., the patient was essentially paralyzed below the neck. He had been placed on a respirator to assist in breathing. Dr. Stone indicated a number of possible diagnoses and recommended additional tests.

Mr. Rosario was again examined by Dr. Stone on January 31st at 10:30 a.m. In light of all the test results, Dr. Stone offered "[p]robable anterior spinal artery syndrome with cervicomedullary involvement" as a potential diagnosis. He felt that this condition was caused by emboli, or blood clots, resulting from either the arteriogram or a prior stroke. In Dr. Stone's opinion, this condition was neither medically nor surgically treatable. The doctor also noted "[d]oubt [Guillain–Barre] or vasculitis...." Further tests were ordered in the hope of finding a poten-

15. See Trial Exhibit 1, Tab C, at pp. 19–20.

16. In Dr. Stone's absence on January 29th, Dr. Butler, director of the VA Consultation Services and senior neurovascular staff consultant in the Neurovascular Unit headed by Dr. Stone, was covering his patients.

tial cause that could be treated. After those tests were completed, a final diagnosis of anterior spinal artery infarction at the C7 level on the right and the C4–C5 level on the left was made.[17]

On February 6, 1985, Dr. del Castillo again examined Mr. Rosario. After being questioned regarding the clonic movements during the arteriogram, Mr. Rosario admitted to Dr. del Castillo that he had experienced the same involuntary movements on two separate occasions prior to entering the Hospital.

Since January 29, 1985, Mr. Rosario has been paralyzed below the neck. With the exception of a temporary stay at New England Medical Center from April 14 to May 6, 1986, Mr. Rosario remained at the VA until September 8, 1986. Thereafter, he was transferred to Jewish Memorial Hospital in Boston where he remains today. Although residing at Jewish Memorial, Mr. Rosario did return briefly to the VA from October 2 to October 7, 1986. In addition, Mr. Rosario was admitted to University Hospital in Boston from February 9 to February 12, 1987 for treatment of complications relating to his quadriparesis.

Given the severity of his injuries, there can be little question that the cost of Mr. Rosario's care, both past and future, is and will continue to be extremely high. Indeed, just for the period between January, 1985 and February, 1991, Mr. Rosario's medical expenses were well in excess of $1.7 million.[18]

### III. CONCLUSIONS OF LAW[19]

#### A. Federal Torts Claim Act

The jurisdiction of this Court is invoked pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.A. § 1346(b) (West 1976 & Supp.1993) and 28 U.S.C.A. §§ 2671–2680 (West 1965 & Supp.1993). By abrogating sovereign immunity, the FTCA enables a

plaintiff to recover money damages from the United States arising from personal injuries

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346(b).

When Mr. Rosario received treatment at the VA in connection with the arteriogram performed on January 28, 1985, Dr. Stone was an attending staff neurologist and director of the Neurovascular Unit, Dr. del Castillo was a senior resident of neurology, and Dr. Stelle was a junior resident of neurology. Each was employed by the Jamaica Plain Veterans' Administration Medical Center. Moreover, these three physicians' treatment of Mr. Rosario was in direct connection with their employment at the Hospital. Therefore, this Court finds that at all times relevant to this action, Dr. Stone, Dr. del Castillo, and Dr. Stelle were employees of the United States government, acting within the scope of their employment for purposes of the FTCA. 28 U.S.C.A. § 1346(b).

#### B. Choice of Law

In an action for negligence under the FTCA, the district court must apply the substantive law of the state wherein the allegedly negligent act or omission occurred. 28 U.S.C.A. § 1346(b); see also Richards v. United States, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); Swift v. United States, 866 F.2d 507, 508 (1st Cir.1989) ("The [FTCA] ... subjects the government to liability ex delicto based on the law of the state in which the tort was committed."). Likewise, any damages assessed pursuant to the

---

17. An anterior spinal artery infarction is a death of tissue along a specific region of the spinal cord due to a blockage or reduction in the blood supply to that area. The lack of blood can be caused by a blockage of either the artery itself or a blood vessel feeding the anterior spinal artery.

18. For a detailed breakdown of the medical expenditures for this period, see Joint Stipulation at ¶¶ 53–55.

19. The parties filed with the Court a Joint Stipulation of Rulings of Law (hereinafter Stipulation of Law ) in which they agreed to the application of certain legal principles. See Docket No. 61, filed March 19, 1991. Where appropriate, this Court has adopted portions of those stipulations.

FTCA must also conform with state law. *See Reilly v. United States,* 863 F.2d 149, 161 (1st Cir.1988).

The situs of the allegedly negligent acts and/or omissions in this case was the Veterans' Administration Medical Center in Jamaica Plain, Massachusetts. This Court is therefore bound to apply Massachusetts law to the facts.[20]

## C. *Negligence Standard—Medical Malpractice*

■ In order to sustain a cause of action for medical malpractice under Massachusetts law, a plaintiff must prove negligence by establishing that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that as a proximate result of the defendant's breach, the plaintiff was damaged. *See Poyser v. United States,* 602 F.Supp. 436, 438 (D.Mass.1984) (applying Massachusetts law); *Rogers v. Okin,* 478 F.Supp. 1342, 1384 (D.Mass.1979) (applying Massachusetts law), *aff'd in part and rev'd in part on other grounds,* 634 F.2d 650 (1st Cir.1980); *see also Harlow v. Chin,* 405 Mass. 697, 701, 545 N.E.2d 602 (1989); *Civitarese v. Gorney,* 358 Mass. 652, 655, 266 N.E.2d 668 (1971); *Berardi v. Menicks,* 340 Mass. 396, 399, 164 N.E.2d 544 (1960).

### 1. *Duty of Care*

■ The proper measure of a physician's conduct is whether the physician has exercised the degree of care and skill of the average qualified practitioner. *Brune v. Belinkoff,* 354 Mass. 102, 109, 235 N.E.2d 793 (1968). Where a physician is considered a specialist in a particular field, the Massachusetts Supreme Judicial Court has stated:

> One holding himself out as a specialist should be held to the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession. And, as in the case of the general practitioner, it is permissible to consider the medical resources available to him.

*Id.; see also Gabrunas v. Miniter,* 289 Mass. 20, 21, 193 N.E. 551 (1935) (a specialist has "the duty to have and use in the operation the care and skill commonly possessed and exercised by similar specialists in like circumstances"); *Johnston v. Stein,* 29 Mass. App.Ct. 996, 998, 562 N.E.2d 1365 (1990); *Alexandridis v. Jewett,* 388 F.2d 829, 833 (1st Cir.1968); *Walton v. United States,* 770 F.Supp. 731, 738 (D.Mass.1991); Restatement (Second) of Torts § 323 (1965).

■ While the duty of a specialist is measured against "the standard of care and skill of the average member of the profession practising the specialty," the specialist's recommendation to a patient of a specific course of treatment need not be in absolute conformity with that which other similarly situated specialists would make if confronted with the same or similar circumstances. *See Grassis v. Retik,* 25 Mass.App.Ct. 595, 602, 521 N.E.2d 411, *review denied,* 402 Mass. 1104, 524 N.E.2d 400 (1988). Rather, "[e]vidence that a particular physician, charged with malpractice, had prescribed a treatment different from that which other physicians, assumed to be competent, would advise [is] not itself proof of [the physician's] negligence; the question [is] whether his prescription represented a competent professional judgment...." *Id.*

This Court finds that Drs. Stone, del Castillo, and Stelle are specialists in the field of neurology and are thus subject to the duty of care articulated in *Brune.*

### 2. *Breach of the Duty of Care*
#### a. **Plaintiffs' Theory of the Case**

According to Plaintiffs, Mr. Rosario's ultimate paralysis was caused in the following manner:

> First, during the vertebral arteriogram, some of the dye—"Renografin 60"—entered the anterior spinal artery, which stems from the left vertebral artery and leads directly in to the spinal cord. There, the Renografin–60 dye can, and sometimes does, cross the "blood-brain barrier" and enter into direct contact with the nerve

---

**20.** It is undisputed by the parties that the Commonwealth of Massachusetts is the relevant state for purposes of this litigation. *See Stipulation of Law* at ¶¶ 1, 2.

cells of the spinal cord itself, where it can irritate and ultimately kill the nerve cells in that portion of the cord. In Mr. Rosario's case, the location where the dye crossed the blood-brain barrier and entered Mr. Rosario's spinal cord was at the C–4 to C–7 level of the neck.... The resulting nerve cell irritation and cell death were evidenced by the episode of violent "tonic/clonic" shaking of Mr. Rosario's arms and shoulders for a period of two to three minutes, followed by a continued weakness in his left arm and shoulder.

According to Dr. Vanna [Plaintiffs' expert witness], what happened after the initial irritation and death of some of the nerve cells in Mr. Rosario's spinal cord, was that the affected area of the cord began to swell. Such swelling is the body's normal protective mechanism in response to such injury. In the spinal cord, however (as in the brain), the effect of this swelling is not beneficial, but can actually be more harmful than the initial injury, because there is very little room within the spine for the cord to expand. As a result, the swelling and expansion of the cord have the effect of compressing or squeezing the small blood vessels that supply blood to the nerve cells within the cord. Eventually, if not treated, this swelling can completely block the blood supply to the various nerve cells in the cord, depriving the cells of oxygen. When a cell is completely deprived of its oxygen supply for a prolonged period of time, it will ultimately die and cannot be regenerated.

In Mr. Rosario's case, the area where the swelling took place was in the C–4 to C–7 level of the spinal cord in a vertical plane, and in approximately the front two-thirds of the cord, which is the area served by the anterior spinal artery. That affected area included the cells that make up the nerve "tracks" that carry messages between the brain and the lower parts of the spinal cord. The swelling occurred over several hours. As the swelling progressed, and as more and more nerve cells were deprived of blood and died off, the nerve tracks gradually ceased to be able to function at the point of the injury. As a result, Mr. Rosario eventually lost the ability to

maintain communication in his spinal cord between his brain and his nervous system below the level of the injury. This was evidenced by the paralysis of his muscles and his loss of control over other body functions such as his bladder.

*Plaintiffs' Brief* at 2–4 (footnote and references to transcript omitted).

### b. Defendant's Response to Plaintiffs' Theory

Defendant disputes Plaintiffs' theory that the contrast material crossed the blood/brain barrier and impacted with the spinal column. Indeed, Defendant maintains that the dye did not cause the clonic movements in the angiography suite on January 28th. One defense expert opined that, more probably than not, the clonic movements were caused by Mr. Rosario tucking his head/chin to his chest during the vertebral arteriogram. This led to a momentary dysfunction of the cervical cord due to his cervical degenerative joint disease. *Defendant's Proposed Findings and Conclusions* at 28. In addition, both defense experts believe that Mr. Rosario's paralysis was a result of the anterior spinal artery infarction which was caused by a combination of the low blood pressure experienced in the afternoon after the arteriogram, and either a pre-existing spinal irritation from the movements in the arteriogram room following the vertebral arteriogram or by a brain lesion from an embolus following the right artery arteriogram. *Id.* at 29.

Defendant asserts that Mr. Rosario's ultimate paralysis was neither attributable to, nor foreseeable by, the doctors at the VA. Accordingly, Defendant argues that the conduct of the physicians and staff conformed to the applicable standard of care imposed upon them by law.

### c. General Resolution

Although both parties have advanced different theories as to what happened to Mr. Rosario, this Court need not make a definitive finding as to the actual cause of Mr. Rosario's paralysis. Rather, there is but one question before this Court. Have Plaintiffs proven by a preponderance of the credible evidence that the physicians and/or staff at

the VA acted negligently in their treatment of Mr. Rosario? In arriving at an answer to that question, this Court must determine if the doctors and staff acted reasonably and in accordance with the average degree of care and skill exercised by similarly qualified medical personnel in similar circumstances.

■ Except in the unusual case in which " 'negligence and [the] harmful results [of that negligence] are sufficiently obvious as to lie within common knowledge,' " the elements of a medical malpractice case must be established by expert testimony. *Haggerty v. McCarthy*, 344 Mass. 136, 139–40, 181 N.E.2d 562 (1962) (quoting *Cyr v. Giesen*, 150 Me. 248, 252, 108 A.2d 316 (1954)); *see also McCarthy v. Boston City Hosp.*, 358 Mass. 639, 643, 266 N.E.2d 292 (1971); *Rogers*, 478 F.Supp. at 1385. The case at bar is no exception. The parties have offered conflicting expert testimony as to the reasonableness of the medical treatment provided Mr. Rosario at the VA. Since the complex medical issues involved here are beyond the "common knowledge" of this Court, Plaintiffs must first establish by expert testimony the average degree of care and skill exercised by qualified practitioners in comparable circumstances, and then the fact that Defendant departed from such standards. *See Rogers*, 478 F.Supp. at 1385; *Haggerty*, 344 Mass. at 139, 181 N.E.2d 562; *Kiley v. Dervin*, 314 Mass. 478, 483–84, 50 N.E.2d 393 (1943);

*Bouffard v. Canby*, 292 Mass. 305, 309, 198 N.E. 253 (1935).

In assessing the credibility of expert witnesses offered by both parties, the Supreme Judicial Court has stated that

the [fact finder's] function, vis-a-vis an expert witness, is to assess the soundness and credibility of [the expert's] opinions. The [fact finder] is entitled to discount, or disbelieve, the expert's testimony. One factor in assessing the strength of expert testimony is the expert's knowledge and experience. A [fact finder] may properly evaluate that knowledge and experience in deciding what weight to give the opinion when reaching a final decision.

*Leibovich v. Antonellis*, 410 Mass. 568, 573, 574 N.E.2d 978 (1991) (citations omitted). It has likewise been observed that "[t]he expert witness' education, training, experience and overall credentials, of course, affect the credibility of that opinion and the weight it will be given." *Rogers*, 478 F.Supp. at 1385; *see also Walton*, 770 F.Supp. at 739; *Letch v. Daniels*, 401 Mass. 65, 69, 514 N.E.2d 675 (1987).

With this rule in mind and after assessing the credibility of each of the medical experts who testified at trial, this Court is of the opinion that Dr. H. Richard Tyler [21] and Dr. Calvin Rumbaugh,[22] the experts who testified

---

21. Dr. H. Richard Tyler, a specialist in the field of neurology, has been board certified by the Board of Psychiatry and Neurology since 1957. From 1956 to 1988, Dr. Tyler was head of the neurology department at Brigham and Women's Hospital in Boston. Since 1988, Dr. Tyler has been the Senior Neurologist on staff at that hospital. Most of Dr. Tyler's medical career until 1988 was spent in a hospital setting. Moreover, since 1956, Dr. Tyler has taught at Harvard Medical School; since 1974, he has been a professor of neurology there. In addition to having had between 1,000 and 4,000 patients who have undergone arteriograms, Dr. Tyler has frequently consulted with other physicians on possible complications associated with the procedure. Dr. Tyler has contributed to medical textbooks and has published approximately 150 articles, of which 70 to 80 are in refereed journals. From approximately 1981 to 1985, Dr. Tyler was the Director of the Therapy and Neurology Program for the American Academy of Neurology and he is a former president of the Boston Society of Neurology and Psychiatry.

22. Dr. Calvin Rumbaugh is a specialist in the field of neuroradiology. He has been board certified in neuroradiology since 1956. From 1975 to 1982, Dr. Rumbaugh was head of the joint department of neuroradiology at Beth Israel Hospital and Brigham and Women's Hospital. When the joint department split in 1982, Dr. Rumbaugh headed the division of neuroradiology at Brigham and Women's Hospital until 1989. Dr. Rumbaugh was a professor of neuroradiology and neuroanatomy at Harvard Medical School from 1975 to 1990. Presently, he is a professor emeritus. Over his medical career, Dr. Rumbaugh has performed or supervised between 25,000 and 30,000 arteriograms, including vertebral and carotid arteriograms. Approximately one-half of the arteriograms Dr. Rumbaugh has performed or supervised have utilized the femoral artery approach—the same approach employed in Mr. Rosario's arteriogram. Dr. Rumbaugh has published between 115 and 130 articles with approximately ninety percent of those appearing in refereed journals. Dr. Rumbaugh is a founding member and former president of the Western Neuroradiological Society.

on behalf of the United States, exhibited a level of knowledge and experience in the fields of neurology and neuroradiology, respectively, superior to that of Plaintiffs' expert, Dr. Stephen Vanna.[23]

This Court is cognizant of the fact that a medical malpractice case is not made out simply because Plaintiffs' expert witness disagreed with Defendant as to the better approach in treating Mr. Rosario. Medicine is an inexact science. It is certainly true that eminently qualified physicians may differ as to what constitutes a preferable course of treatment in a particular case. Such differences of opinion, however, do not necessarily amount to medical malpractice. Based largely on the opinions of Drs. Tyler and Rumbaugh, this Court finds that regardless of the actual cause of Mr. Rosario's paralysis, the physicians and staff at the VA could not reasonably have been expected to foresee such an occurrence.

### d. Plaintiffs' Specific Allegations of Negligence

Plaintiffs allege that the physicians and Hospital deviated from the applicable duty of care owed to Mr. Rosario in the following respects:

(1) The anticoagulant drug, Heparin, should not have been prescribed for Mr. Rosario when he was admitted to the Hospital on January 18, 1985;

(2) Dr. Stone misdiagnosed or, alternatively, failed to record Mr. Rosario's left arm and shoulder weakness during the

neurological examination conducted in the angiography suite after Mr. Rosario experienced the clonic movements;

(3) The doctors should have administered steroids to Mr. Rosario during and after the arteriogram;

(4) Dr. del Castillo and/or Dr. Stelle *should have administered steroids for Mr. Rosario as his condition gradually deteriorated;*

(5) Mr. Rosario's neurological status was not monitored with sufficient care after the arteriogram;

(6) Dr. del Castillo misdiagnosed Mr. Rosario's post-arteriogram weakness as "conversion reaction;" and

(7) The VA failed to obtain Mr. Rosario's true informed consent to perform the arteriogram.

The Court will evaluate each of these allegations in turn. In so doing, the Court will make extensive use of the expert witness testimony given at trial.

### (1) Use of the anticoagulant drug Heparin

■ Although Plaintiffs state in their Post–Trial Brief that the use of Heparin had only minimal effect, if any, on Mr. Rosario's ultimate paralysis,[24] this Court will nevertheless address the issue in light of Dr. Vanna's testimony. In Dr. Vanna's opinion: (1) the Heparin weakened Mr. Rosario's blood/brain barrier, thus enabling the Renografin–60 to come into direct contact with the spinal cord;

---

**23.** Dr. Stephen Vanna is a specialist in the field of neurology. He has been board certified by the American Board of Psychiatry and Neurology since 1974. Dr. Vanna testified that the last arteriogram he conducted was in 1975 or 1976. Of the arteriograms he has done, Dr. Vanna has neither performed a selective vertebral artery arteriogram, like the one performed on Mr. Rosario, nor has he ever done a femoral approach arteriogram. Rather, the procedure he employed was the percutaneous technique. Under this technique, a catheter is not used; the contrast material is injected directly into the left carotid artery, located in the neck, and the right brachial artery, located in the arm. Dr. Vanna was a Clinical Instructor of Neurology at the University of Pennsylvania from July, 1971 to January, 1974. The last teaching position Dr. Vanna held was as a Clinical Assistant Professor of Neuroscience at the College of Medicine and

Dentistry of New Jersey. Dr. Vanna's curriculum vitae indicates that, although he has written four articles during his medical career, one is an unpublished piece and only one article has been published in a refereed journal. Dr. Vanna devotes approximately ninety percent of his practice to in-office care, as opposed to hospital care.

**24.** *See Plaintiffs' Brief,* at 16–17. It should also be noted that Plaintiffs elected not to raise the issue of pre-arteriogram care in its post-trial papers, stating that

[a]lthough Dr. Vanna explained how the V.A. misdiagnosed and mistreated Mr. Rosario from the outset including putting him on Heparin for ten days, this aspect of his treatment is not being discussed because it had only minimal, if any, effect on the ultimate paralysis.

*Id.* at 16 n. 14 (reference to transcript omitted).

(2) the spinal cord began to swell as a result of its contact with the dye; and (3) the swelling of the cord caused the clonic movements and eventual spinal tissue death.

For these reasons, Dr. Vanna concluded that Mr. Rosario should not have been placed on the anticoagulant medication when he was admitted to the VA. This Court finds such a conclusion unworthy of credence. Other evidence adduced at trial revealed that Heparin is a common and widely used drug in patients where a stroke is suspected. In addition to preventing harmful blood clotting, Heparin is used to deter ongoing or future strokes in patients who demonstrate stroke-like symptoms. Moreover, the Court credits the testimony of Dr. Tyler that it was unlikely for Heparin to cause a breakdown of the blood/brain barrier in this case. Indeed, in Dr. Tyler's forty years of practicing medicine, he has never heard of Heparin affecting the blood/brain barrier in the way Dr. Vanna suggests. In light of the fact that doctors at the VA reasonably believed that Mr. Rosario was suffering from a possible stroke, this Court finds that it was medically appropriate under the circumstances to prescribe Heparin.

### (2) Dr. Stone's Misdiagnosis/Failure to Record

Plaintiffs contend that Dr. Stone acted negligently either by misdiagnosing the cause of Mr. Rosario's clonic movements and subsequent left arm weakness in the angiography suite, or by failing to note the incident in Mr. Rosario's chart. For purposes of clarity, this Court will address each of these allegations separately.

### (a) Dr. Stone's alleged misdiagnosis

Dr. Vanna testified that, when called to the angiography suite by Dr. Srinivasan, Dr. Stone should have diagnosed the cause of Mr. Rosario's clonic movements and left arm weakness as neurological defects emanating from the spinal cord. However, there are several reasons why this Court disagrees with Dr. Vanna and is convinced that Dr. Stone acted within the acceptable bounds of competence expected of an average qualified neurologist in 1985.

The parties agree that whatever happened to Mr. Rosario that day was an extremely rare occurrence. Even Dr. Vanna testified that, in his years of experience, he had never seen a case of clonic movements in temporal relationship to an arteriogram. Likewise, Dr. Rumbaugh stated that he had never experienced a complication of this kind resulting from a vertebral arteriogram. Both Dr. Rumbaugh and Dr. Tyler agreed that Dr. Stone's conduct in the angiography suite did not deviate from the standard of care.

Even if we were to assume that Dr. Vanna was correct in his statement that the contrast material crossed the blood/brain barrier and came into contact with Mr. Rosario's spinal cord, Dr. Stone could not have been expected to accurately diagnose this as the cause of the clonic movements and subsequent left arm weakness. This conclusion was supported by both Dr. Tyler and Dr. Rumbaugh. The only concrete information the doctors in the angiography suite had on which to base a preliminary conclusion was a brief seizure. In addition, Mr. Rosario told the treating team that he had experienced the same involuntary movements before entering the Hospital. This Court does not agree with Dr. Vanna's conclusion that, based on the limited information then available, Dr. Stone should have been able to diagnose the problem and then prescribe a course of treatment. It would have been extremely difficult, if not impossible, under such circumstances to arrive at the diagnosis suggested by Dr. Vanna. Quite simply, Drs. Stone and Srinivasan did not have enough data to arrive at an accurate diagnosis.

Plaintiffs argue that Dr. Stone reached an inappropriate conclusion because he performed an inadequate neurological examination of Mr. Rosario in the angiography suite. This Court disagrees. When called, Dr. Stone immediately went to the angiography suite for an emergency consultation with Dr. Srinivasan. As Dr. Tyler testified, the foremost issue at that time was whether to proceed with the arteriogram. To that end, Dr. Stone conducted a neurological examination of Mr. Rosario and discussed the situation with Dr. Srinivasan. The decision to proceed with the arteriogram had to be arrived at quickly because the catheter was still in Mr. Rosario. The longer the catheter remains in

the patient, the more dangerous the procedure becomes. It was therefore acceptable for Dr. Stone to conduct a neurological exam just long enough to gain the information necessary to make an informed decision whether to proceed. Even Dr. Vanna admits that the length of an emergency neurological exam depends on the nature of the emergency.

On the basis of his examination, Dr. Stone believed he had enough information to arrive at an intelligent decision whether to proceed. After weighing the conflicting concerns, Drs. Stone and Srinivasan agreed that the risks of terminating the procedure at that point outweighed the risks of continuing. This Court agrees with Dr. Tyler's opinion, and thus concludes, that Dr. Stone's examination and the subsequent joint decision to proceed were appropriate under the circumstances and did not violate the duty of care.

### (b) Dr. Stone's Failure to Record

■ Plaintiffs further contend that Dr. Stone should have included in Mr. Rosario's chart a notation regarding the clonic movements and subsequent left arm weakness, along with follow-up orders to other physicians and staff. Specifically, Plaintiffs allege that Mr. Rosario's care was seriously compromised as a result of Dr. Stone's failure to document his neurological findings and the patient's overall condition post-seizure. Plaintiffs state that

> the diagnosis and treatment of Mr. Rosario's subsequent weakness and paralysis were influenced by Mr. Rosario's condition immediately after the shaking episode and by the existence and extent of any lingering neurological defects at the time.... [T]he more complete the record, the better equipped the V.A. doctors would have been to diagnose and treat Mr. Rosario. It is reasonable to conclude, therefore, that a substantive factor in the V.A.'s failure to diagnose and treat Mr. Rosario was the defects in its own records of his condition.

*Plaintiffs' Brief* at 18–19 (reference to transcript omitted). This Court again disagrees.

With respect to the failure to document, the Court is convinced that the lack of a note from Dr. Stone in the patient's chart, while perhaps not the best practice, does not rise to the level of medical malpractice. Plaintiffs and Dr. Vanna suggest that, because of Dr. Stone's failure to write a note in Mr. Rosario's chart, none of the subsequent treating physicians or nurses were privy to the findings from Dr. Stone's neurological examination. However, an examination of the evidence demonstrates that such a suggestion is unfounded.

Dr. Stone was called to an emergency situation. As Dr. Tyler testified, the essential part of any emergency consultation is communication—communication with the patient and communication with the treating physician. Dr. Stone conducted a neurological examination and then communicated his findings to Dr. Srinivasan. Both doctors discussed the situation and arrived at a mutual decision to continue with the procedure. The treating physician was fully aware of what Dr. Stone was thinking. There is no question that he effectively communicated his neurological findings and recommendations to the treating team. Therefore, this Court concludes that Dr. Stone's conduct in the angiography suite was not negligent because of his failure to document the results of his neurological examination in writing. This Court is satisfied that Dr. Stone's findings and observations were sufficiently documented by communicating with Dr. Srinivasan.

With respect to the clonic movements and left arm weakness, Dr. Stone's failure to make a notation of the episode was insignificant under the circumstances. The record clearly demonstrates that once the arteriogram was concluded, Nurse Stewart wrote in Mr. Rosario's record that he had experienced a seizure during the procedure and that he was experiencing left arm weakness. In addition, Nurse Stewart directed the ward nurses to continue monitoring Mr. Rosario's weakness. The evidence demonstrates that the physicians and nurses who treated Mr. Rosario after the arteriogram were well aware of both the seizure and left arm weakness.

With respect to Dr. Stone's failure to write post-arteriogram orders before leaving the angiography suite, the Court finds that there was no breach of the duty of care. It was

not Dr. Stone's place to write the post-procedure orders. Rather, the accepted medical practice was to have the treating neuroradiologist, Dr. Srinivasan in this case, do so. In following that accepted practice, Dr. Srinivasan did write post-procedure orders.

Having considered the testimony and evidence, this Court finds that Dr. Stone's conduct in the angiography suite on January 28, 1985, was reasonable under the circumstances and did not deviate from accepted medical practice or the standard of care of an average qualified neurologist in 1985.

### (3) The failure to administer steroids during and after the arteriogram

▇ Dr. Vanna testified that, upon arrival in the angiography suite, Dr. Stone not only should have diagnosed the cause of the clonic movements and left arm weakness, but should have also administered steroids immediately.[25] Indeed, Plaintiffs and Dr. Vanna suggest that the overwhelming weight of the evidence suggests that the standard of care called for the use of such action. However, as this Court already stated, it would be unreasonable to have expected Dr. Stone at that time to accurately diagnose the cause of Mr. Rosario's clonic movements and left arm weakness.

To say that the doctors acted negligently by not administering steroids necessarily suggests that the use of steroids would have, at the very least, helped in preventing or minimizing Mr. Rosario's ultimate paralysis. While acknowledging that steroids would have had no direct effect on the anterior spinal artery infarction itself, Plaintiffs argue that steroids would have reduced the spinal cord swelling which allegedly led to the infarction. Dr. Vanna testified that Dr. Stone should have recognized this and then prescribed steroids to combat the spinal cord swelling. Plaintiffs cite a list of medical literature which they believe supports this conclusion. However, not only do none of the studies reported mirror the facts of this case, but most of the articles could be classified as out-dated with respect to the procedural techniques employed.

As Dr. Rumbaugh testified, angiography was not as advanced during the time period when the articles were written. The angiographic techniques used in the reported studies were very different than those utilized in Mr. Rosario's procedure. The techniques reported in the articles were crude by 1985 standards. Many of the articles deal with the use of very toxic contrast materials administered in elevated dosages. The catheters used in the article studies were large and unrefined.[26] Moreover, according to Dr. Rumbaugh the cases reported in the articles involved procedures where arteries other than the vertebral artery were under examination. The literature simply does not indicate that, given Mr. Rosario's unusual symptoms, an average qualified neurologist in 1985 would have considered steroid treatment as the logical and reasonable course of action. This Court therefore believes that Plaintiffs' reliance on the proffered medical literature is misplaced.

The issue of whether steroids should have been used in the angiography suite necessarily depends on whether an average qualified

25. *See* Trial Transcript, Day II, pp. 59–60:
MS. DURRELL (Counsel for Defendant): So if I understand you correctly, what you're really saying is when Dr. Stone walked into the arteriogram room, he should have diagnosed Mr. Rosario right there on the spot as having this unusual reaction that you say he had; is that right?
DR. VANNA: He should have.
MS. DURRELL: He should have diagnosed it right then and there?
DR. VANNA: Yes.
MS. DURRELL: And then he should have prescribed steroids?
DR. VANNA: Yes.

26. As Dr. Rumbaugh explained, the walls of the arteries can be damaged when large catheters are used. In addition, a large catheter can block all blood flow in the artery so the dye is undiluted when it passes through the artery and its branches. If one of the artery branches happens to feed the spinal cord, then the 100% undiluted dye impacts with the spinal cord. However, this was not the case with Mr. Rosario's arteriogram. As stated earlier, before Dr. Srinivasan began his examination of the left vertebral artery, he injected a small amount of the contrast material into the left subclavian artery, the entry point to the left vertebral artery, in order to ensure that there was proper blood flow to the area where the arteriogram was to be performed. There is no evidence or allegation that the catheter used by Dr. Srinivasan cut off the blood flow to the arteries.

neurologist in 1985 would have been able to arrive at a diagnosis that was treatable with steroids. The Court has already stated that given the unusual nature of Mr. Rosario's seizure, arriving at an accurate diagnosis at that time was virtually impossible. Accordingly, it was not reasonably foreseeable that Mr. Rosario's condition was one that could have been helped by steroids.

There is an additional component which must be considered. The decision to administer steroids must be arrived at with extreme caution. As all the expert witnesses testified, steroids have many dangerous side effects, such as increased risk of infection and gastro-intestinal bleeding. Bearing those risks in mind, this Court agrees with the defense experts' opinion that it would not have been prudent to administer steroids to a patient where no accurate diagnosis could reasonably be made, especially in the dosages recommended by Dr. Vanna.[27]

Whatever the cause of the infarction, there is one inescapable truth—the clonic movements were an extremely rare occurrence. Dr. Srinivasan has performed between 750 and 900 arteriograms in his career and has never seen a patient experience clonic movements. Dr. Rumbaugh has conducted or supervised between 25,000 and 30,000 arteriograms and he has never seen complications of this nature arising from a vertebral arteriogram. Moreover, Dr. Rumbaugh has never seen a case where, as here, the patient was a quadriplegic within 24 hours after an arteriogram. Similarly, Dr. Tyler testified that, although he has heard of one such case in the course of his career, he has never personally seen an anterior spinal artery infarction resulting from a reaction to contrast material used in an arteriogram. Even Dr. Vanna testified that he has never had a situation such as this. Yet Plaintiffs would have the Court hold that Dr. Stone's conduct fell below a reasonable standard of care because he failed to prescribe steroids, a treatment that could have worsened Mr. Rosario's condition. In light of the duty of care imposed by Massachusetts law, this Court cannot make

such a determination. Accordingly, based on the fact that neither Dr. Stone nor Dr. Srinivasan could have reasonably arrived at an accurate diagnosis, this Court does not agree with Plaintiffs that "the obvious treatment [for Mr. Rosario] was steroid medication."[28]

### (4) Failure of Dr. del Castillo or Dr. Stelle to Administer Initial Dose of Steroids

Plaintiffs similarly contend that Dr. del Castillo and/or Dr. Stelle should have prescribed steroids when Mr. Rosario experienced weakness in Ward 6–B and later in the ICU. However, for reasons similar to those just enumerated, this Court finds that Dr. del Castillo and Dr. Stelle acted properly in not prescribing steroids for Mr. Rosario.

This Court finds that Dr. del Castillo and Dr. Stelle did not prescribe steroids for Mr. Rosario because they did not have a definite diagnosis of his condition. Neither doctor could reasonably ascertain the nature and cause of the clonic movements and subsequent weakness. The Court accordingly finds that the failure to administer steroids did not deviate from the applicable duty of care. In fact, this Court is persuaded by the testimony that the use of steroids could have actually worsened Mr. Rosario's condition. For the reasons stated earlier, this Court is likewise not persuaded by the medical literature cited by Plaintiffs. Therefore, based on the reasonably high degree of uncertainty surrounding Mr. Rosario's condition, coupled with the serious side-effects that steroid medication could have had on his already fragile condition, this Court finds that Drs. del Castillo and Stelle were not negligent by failing to administer steroids.

### (5) The failure to monitor Mr. Rosario's status closely after the arteriogram

Plaintiffs allege that the doctors and staff at the VA failed to adequately monitor Mr. Rosario's neurological status upon his return to Ward 6–B and thereafter. An examination of the evidence, however, does not support that allegation. As noted in the Find-

---

27. Dr. Vanna testified that Dr. Stone should have prescribed 4 milligrams of the steroid Decadron, to be given intravenously every four hours for a few days.

28. *Plaintiffs' Brief* at 22.

ings of Fact, Mr. Rosario's post-arteriogram condition was closely monitored and noted.

Based on that evidence, this Court finds that Mr. Rosario's condition was constantly monitored by both the physicians and staff at the VA. The physicians and staff acted within the acceptable standards of care with respect to Mr. Rosario's post-arteriogram care.

### (6) Dr. del Castillo's diagnosis of Mr. Rosario's post-arteriogram weakness as "conversion reaction"

Plaintiffs next contend that Dr. del Castillo provided negligent care when Mr. Rosario was returned to Ward 6–B after the arteriogram. Specifically, Plaintiffs argue that, in the face of Mr. Rosario's unusual condition, Dr. del Castillo should not have made the "conversion reaction" diagnosis and should have consulted a more senior physician.

### (a) The "Conversion Reaction" Diagnosis

■ As support for their argument that the conversion reaction diagnosis was negligent, Dr. Vanna testified that

conversion reaction is a diagnosis of exclusion. After all possible organic causes have been eliminated, and also [if] a person has some degree of emotional reason to have converted the symptoms, then the diagnosis can be made. In this case there were definite organic changes that were documented in the chart, and these changes were real, and therefore conversion reaction diagnosis [had] no place in the chart.

Trial Transcript, Day II, at 37–38. Plaintiffs further point out that the diagnosis was obviously incorrect based on Mr. Rosario's ultimate condition.

As noted in the Findings of Fact, Dr. del Castillo's neurological examination failed to discover the existence of a lesion, including a spinal cord lesion.[29] Since the doctor could find no neurological cause for Mr. Rosario's weakness, he concluded that the quadriparesis was a temporary conversion reaction. As the defense experts stated, a conversion reaction can be diagnosed when there is some positive psychiatric history. In this case there clearly was such a history—Mr. Rosario's mother had warned him that if he underwent the arteriogram he would be paralyzed as a result. As mentioned, Mr. Rosario had informed Dr. del Castillo of this comment.[30]

This Court agrees with Dr. Tyler's opinion that Dr. del Castillo's conversion reaction diagnosis was, under the circumstances, a reasonable and appropriate hypothesis. Dr. del Castillo conducted a neurological examination and was unable to reconcile the results of that exam with the symptoms the patient was exhibiting. Given the doctor's inability to locate a possible lesion and the mother's warning, this Court finds that, even though the diagnosis ultimately proved to be incorrect, it was reasonable at the time for Dr. del Castillo to conclude that the patient was experiencing a conversion reaction. This Court must examine Dr. del Castillo's conduct as of the time it occurred. Plaintiffs cannot maintain that the diagnosis of conversion reaction was negligent simply because in hindsight it ultimately proved to be incorrect.

### (b) Failure to Consult a More Senior Physician

■ Plaintiffs also contend that it was negligent for Dr. del Castillo not to have conferred with a more senior physician before arriving at the conversion reaction diagnosis. They assert that, since Dr. del Castillo was confused as to the cause of Mr. Rosario's weakness, he should have consulted with a more senior neurologist.[31] Plaintiffs did

---

29. Generally speaking, a lesion is an injury, damage, or abnormal change in an organ or tissue that impairs its function.

30. While Plaintiffs maintain that Dr. del Castillo's neurological examination was inadequate, it must be noted that Dr. Stelle conducted another neurological exam on Mr. Rosario approximately two hours later. Her examination yielded almost identical results as Dr. del Castillo's.

31. In this regard, Plaintiffs state:

[Dr. del Castillo] was over his head, and he should have consulted someone more senior. Dr. del Castillo admitted that the practice at the V.A. Hospital at the time was that, if a senior resident, such as himself, was concerned about a patient and could not handle the patient's problem, the senior resident was supposed to consult with one of the attending staff neurologists; and he failed to do that. *Plaintiffs' Brief* at 20 (citations to transcript omitted).

correctly observe that it was the Hospital's policy to have a resident consult with a more senior physician if he was not in control of the patient's situation. However, Dr. del Castillo reasonably could have believed that such was not the case here.

Although the results of the neurological examination were not readily reconcilable with Mr. Rosario's weakness, Dr. del Castillo had a working diagnosis for the problem—a conversion reaction. As explained above, the conversion reaction diagnosis was reasonable under the circumstances. Accordingly, Dr. del Castillo was confronted with a situation which, while enigmatic, was one he reasonably could have considered within his abilities.

Defendant's expert witnesses supported this conclusion. Dr. Tyler testified that it was acceptable for Dr. del Castillo not to have contacted a more senior neurologist at the time he made the conversion reaction diagnosis. Both Dr. Rumbaugh and Dr. Tyler testified that it was proper for Dr. del Castillo not to have called upon other physicians until the morning of January 29th. More specifically, Dr. Tyler stated that, based on his experience at Brigham and Women's Hospital, a senior resident in neurology can usually go overnight without consulting other physicians. On cross-examination, Dr. Tyler elaborated by stating that "it would not be out of practice for a senior [resident] neurologist to assume major responsibility for patient care, ... even in the face of some complication, as long as he felt it was under control." Trial Transcript, Day VI, at 145.

When Dr. del Castillo examined Mr. Rosario in the afternoon of January 28th, he did, in fact, feel he was in control of the situation. Before leaving the Hospital on January 28th, he discussed the matter with Dr. Stelle. He then planned to reexamine Mr. Rosario the following morning. As was stated earlier, Dr. del Castillo's failure to consult a more senior physician does not constitute medical malpractice. This Court therefore finds that Dr. del Castillo acted appropriately under the circumstances.

## (7) Informed Consent

Plaintiffs next contend that Defendant failed to obtain a valid informed consent from Mr. Rosario. The doctrine of informed consent derives from the notion that "[t]here is implicit recognition in the law of the Commonwealth, as elsewhere, that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity.... In short, the law recognizes the individual interest in preserving the 'inviolability of his person.'" *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 738–39, 370 N.E.2d 417 (1977) (citations omitted); *see also Harnish v. Children's Hosp. Medical Center,* 387 Mass. 152, 154, 439 N.E.2d 240 (1982); *In re Spring,* 380 Mass. 629, 634, 637–38, 405 N.E.2d 115 (1980). For indeed, "it is the prerogative of the patient, not the physician, to determine ... the direction in which ... [the patient's] interests lie.'" *Harnish,* 387 Mass. at 154, 439 N.E.2d 240 (quoting *Cobbs v. Grant,* 8 Cal.3d 229, 242, 104 Cal.Rptr. 505, 502 P.2d 1 (1972)); *see also Canterbury v. Spence,* 464 F.2d 772, 781 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

Before a patient can be expected to give his true informed consent, he must be able to make an intelligent decision whether to proceed with a specific course of medical treatment. In order for a patient to make such a decision, he "requires knowledge of the available options and the risks attendant on each." *Harnish,* 387 Mass. at 154, 439 N.E.2d 240. While the law acknowledges a patient's right to know, it also recognizes that the right "must be harmonized with the recognition that an undue burden should not be placed on the physician." *Id.* at 155, 439 N.E.2d 240. Therefore, "a physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that the physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure." *Id.; see also Halley v. Birbiglia,* 390 Mass. 540, 548, 458 N.E.2d 710 (1983); *Schenker v. Binns,* 18 Mass.App.Ct. 404, 407 n. 5, 466 N.E.2d 131 (1984).

The kind of information that a physician should reasonably possess is that which is possessed by an average qualified physician or, in the case of a physician practicing a specialty, by the average qualified physician practicing that specialty. *Brune*, 354 Mass. at 109, 235 N.E.2d 793. Failure of a physician to "divulge in a reasonable manner to a competent adult patient sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure constitutes professional misconduct...." *Harnish*, 387 Mass. at 154–55, 439 N.E.2d 240.

In addition, in order to sustain a cause of action for malpractice based on a lack of informed consent, a patient must also prove by a preponderance of the evidence "that had the proper information been provided neither he nor a reasonable person in similar circumstances would have undergone the procedure." *Id.* at 158, 439 N.E.2d 240; *see also Martin v. Lowney*, 401 Mass. 1006, 1007, 517 N.E.2d 162 (1988); *Schroeder v. Lawrence*, 372 Mass. 1, 5, 359 N.E.2d 1301 (1977); *Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).[32] When arriving at a determination of whether a patient would have undergone a planned procedure, the court must rely on foresight, not hindsight. *Goldstein*, 728 F.2d at 39. Indeed, "[d]issatisfaction with the result does not make it more probable than not that the plaintiff would have declined the procedure." *Id.*

This Court finds that, at the time Mr. Rosario was visited by Dr. del Castillo on the morning of January 28th, he was coherent and had not yet received any pre-arteriogram sedation. Based on that conversation (described at pp. 6–7 *supra*), this Court is convinced that Dr. del Castillo provided Mr. Rosario sufficient information upon which to arrive at an intelligent decision to undergo the arteriogram.

Even though Mr. Rosario could speak and read English, the VA exercised special care by having Dr. del Castillo discuss the proce-

dure with him in Spanish. In addition to explaining the risks associated with an arteriogram, including the possibility of paralysis, Dr. del Castillo also explained the risks of not undergoing the procedure. It is evident to this Court that Mr. Rosario understood those risks prior to signing the informed consent forms. There is no evidence in the record to suggest that he was either coerced or subjected to any undue influence by the Hospital or any of its physicians or staff in an attempt to obtain his informed consent for the arteriogram. The Court therefore concludes that Dr. del Castillo acted reasonably and in conformity with general practice in securing Mr. Rosario's informed consent.

Moreover, Plaintiffs have failed to establish that Dr. del Castillo withheld any information that was reasonably necessary for Mr. Rosario to make an informed decision. Plaintiffs have not shown that, even if the doctor had supplied additional significant medical information, if any was available, either Mr. Rosario or a reasonable person faced with similar circumstances would have withheld his consent to undergo the procedure. Accordingly, this Court finds that Mr. Rosario knowingly, intelligently, and voluntarily signed the standard VA "informed consent" form and "Request for Administration of Anesthesia and for Performance of Operations and Other Procedures" form. The Hospital thus obtained a true and valid informed consent from Mr. Rosario prior to the arteriogram being performed.

### 3. *Causation*

Even if we were to assume, arguendo, that Defendant had breached its duty of care to Mr. Rosario in any one of the ways discussed above, Plaintiffs have failed to prove to the Court by a preponderance of the credible evidence that Mr. Rosario's injuries were a proximate result of any such breaches.

■ It is incumbent upon a plaintiff in a medical malpractice action to establish a causal connection between the defendant's alleged negligence and the ensuing injuries.

---

**32.** Based on Dr. Tyler's experience, once a patient has discussed the risks associated with an arteriogram with the treating physician, only one

in five or six ultimately refuses to give his consent for the procedure.

*See Harlow,* 405 Mass. at 702, 545 N.E.2d 602 ("A plaintiff in a medical malpractice action has the burden of proving that the physician's negligence was the proximate cause of the plaintiff's injuries."); *Murphy v. Conway,* 360 Mass. 746, 749, 277 N.E.2d 681 (1972); *Civitarese,* 358 Mass. at 655, 266 N.E.2d 668; *Semerjian v. Stetson,* 284 Mass. 510, 512, 187 N.E. 829 (1933) ("The burden [is] on the plaintiff to establish a causal connection between negligence of the doctor and [the plaintiff's] injuries; that is to prove that an act or omission of the doctor caused the injury and also that such act or omission was negligent."); *Held v. Bail,* 28 Mass.App.Ct. 919, 920, 547 N.E.2d 336 (1989), *review denied,* 407 Mass. 1101, 552 N.E.2d 863 (1990); *Glicklich v. Spievack,* 16 Mass.App.Ct. 488, 492, 452 N.E.2d 287, *review denied,* 390 Mass. 1103, 454 N.E.2d 1276 (1983); *Walton,* 770 F.Supp. at 739.

The trier of fact "may not speculate about the possible results of administering or withholding particular therapy." *Held,* 28 Mass. App.Ct. at 921, 547 N.E.2d 336; *see also Murphy,* 360 Mass. at 749, 277 N.E.2d 681. The causal connection "generally must be established by expert testimony that the injury was more probably than not a result of the physician's negligence." *Harlow,* 405 Mass. at 702, 545 N.E.2d 602; *see also Berardi,* 340 Mass. at 401–02, 164 N.E.2d 544. And while a " 'plaintiff [is] not required to show the exact cause of [the] injuries or to exclude all possibility that they resulted without fault on the part of the defendant,' " *Miles v. Edward O. Tabor, M.D., Inc.,* 387 Mass. 783, 787, 443 N.E.2d 1302 (1982) (quoting *Woronka v. Sewall,* 320 Mass. 362, 365, 69 N.E.2d 581 (1946)); *see also Samii v. Baystate Medical Center, Inc.,* 8 Mass.App. Ct. 911, 912, 395 N.E.2d 455 (1979), this Court finds that Plaintiffs have failed to establish the requisite causal connection by a preponderance of the credible evidence.

 This Court is not persuaded that, if any of the allegations of negligence were true, Mr. Rosario's ultimate paralysis could or would have been prevented. For example, even if steroids had been administered to Mr. Rosario immediately after the clonic movements in the angiography suite, or at some later time, this Court agrees with Drs. Rumbaugh and Tyler that such treatment would have had no effect on the anterior spinal artery infarction which is believed to have ultimately caused the paralysis. Indeed, both doctors were very clear in their opinion that steroid treatment would have been ineffective and potentially harmful. Accordingly, this Court finds that, even if the physicians and Hospital were negligent in their care of Mr. Rosario, Plaintiffs have failed to establish the necessary causal connection between such negligence and the ultimate injury.

### D. *Loss of Consortium Claim*

 Under Count II of the Complaint, Epifania Nieves seeks damages for the loss of Mr. Rosario's care, companionship, and support. As this Court noted in its previous Memorandum and Order (Docket No. 65), the seminal case on the issue of filial consortium was *Norman v. Massachusetts Bay Transp. Auth.,* 403 Mass. 303, 529 N.E.2d 139 (1988). In holding that parents could not recover for the loss of their injured child's consortium, the Supreme Judicial Court in *Norman* stated:

Although parents customarily *enjoy* the consortium of their children, in the ordinary course of events a parent does not *depend* on a child's companionship, love, support, guidance, and nurture in the same way and to the same degree that a husband depends on his wife, a wife depends on her husband, or a minor or disabled adult child depends on his or her parent.

*Id.* at 306, 529 N.E.2d 139 (emphasis in original). However, in reaction to the holding in *Norman,* the Massachusetts legislature enacted Mass.Gen.Laws Ann. ch. 231, § 85X (West Supp.1993). That statute provides:

The parents of a minor child or *an adult child who is dependent on his parents for support* shall have a cause of action for loss of consortium of the child who has been seriously injured *against any person who is legally responsible for causing such injury.*

(emphasis added).

As the Court noted in its earlier Order, Plaintiffs have attempted to circumvent the

aegis of ch. 231, § 85X by asserting that the statute does not apply to Mrs. Nieves' claim. *See* Opposition to Defendant's Motion for Partial Summary Judgment, Docket No. 34, at 3. This Court, however, found that the statute did apply to the facts in this case.[33] Plaintiffs have offered no reason for questioning this earlier finding.

Since the statute only provides for recovery from "any person who is legally responsible for causing [the] injury," Mrs. Nieves is not entitled to recover from Defendant. This Court has determined that the United States was not legally responsible for Mr. Rosario's injuries. Accordingly, Mrs. Nieves cannot recover from Defendant for the loss of consortium resulting from her son's paralysis.

Mrs. Nieves' claim would fail even if this Court were to assume that the Defendant was negligent in its treatment of Mr. Rosario. The viability of such a loss of consortium claim in the aftermath of § 85X was reexamined by the Supreme Judicial Court in *Monahan v. Town of Methuen,* 408 Mass. 381, 389, 558 N.E.2d 951 (1990). Before a parent is able to recover for the loss of an adult child's consortium, the trial court must first determine whether, as is required by the statute, the adult child was dependent on his parents for support. In arriving at a determination of this threshold issue, the court in *Monahan* held that "in order for an adult child to be considered 'dependent on his parents for support,' that child must be, at the very least, *financially* dependent on his parents, either prior to or after the accident, or both." *Id.* at 390, 558 N.E.2d 951 (emphasis in original). Based on the evidence at trial, this Court finds that Mr. Rosario was not financially dependent on his mother either prior or subsequent to sustaining his permanent injuries.

According to the testimony of Ms. Devina Nieves Masso, Mr. Rosario's sister, Mr. Rosario did live with his mother before entering the Hospital. However, Ms. Nieves Masso testified that, in fact, it was Mr. Rosario's responsibility to care for Mrs. Nieves. And although there is little doubt that Mr. Rosar-

io and his mother have a very close emotional relationship, there is simply no evidence indicating that Mr. Rosario was financially dependent on Mrs. Nieves in the way contemplated by the *Monahan* court. Therefore, the loss of consortium claim must fail.

## IV. CONCLUSION AND ORDER OF JUDGMENT

Massachusetts law requires that a physician act competently, not that the physician "guarantee a cure of the patient's condition or even an improvement of it." *Grassis,* 25 Mass.App.Ct. at 602, 521 N.E.2d 411. Plaintiffs have failed to show, by a preponderance of the credible evidence, that the physicians, nurses, staff, or the VA itself acted negligently in their treatment and care of Mr. Rosario. Moreover, no evidence adduced at trial supports the conclusion that Mr. Rosario was financially dependent on his mother. This Court therefore finds that Dr. Stone, Dr. del Castillo, Dr. Stelle, and the Veterans' Administration Medical Center acted in a competent manner commensurate with the duty of care imposed upon them under Massachusetts law.

Although this Court is sympathetic to Mr. Rosario's condition, it is unable to circumvent the law in order to grant the recovery Plaintiffs seek. Judgment must therefore be entered in favor of Defendant, the United States of America.

**SO ORDERED.**

---

33. To reiterate the Court's earlier findings, the enabling statute clearly demonstrates that this Court must apply § 85X, as the statute is applicable "to all causes of action which accrued after [September 1, 1986] and to all similar causes of

action now pending in any court in the commonwealth." St.1989, ch. 259, § 2. Since jurisdiction in this case is invoked pursuant to the FTCA, the Court is compelled to apply the law that would bind a state court similarly situated.